# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                          )
The Exotic Wildlife Association,          )
Charly Seale, Eddy Blassingame,           )
Terry Caffey, Ray Dockery,                )
Joe Green, Nancy Green,                    )
Roy Leifester, Thomas Oates,              )
and Ed Valicek,                           )   Civil Action No. 1:12-cv-00340-RBW
                                          )
            Plaintiffs,                    )    Hon. Reggie B. Walton
                                          )
        v.                                )
                                          )
The U.S. Department of the Interior,      )
Ken Salazar, in his official capacity     )
as Secretary of the U.S. Department       )
of the Interior; Daniel Ashe, in his      )
Official capacity as Director of the      )
U.S. Fish and Wildlife Service; and, the  )
U.S. Fish and Wildlife Service            )
                                          )
            Defendants.                    )
_____)


## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

This motion will decide the fate of three rare species of African antelope—

the scimitar-horned oryx (*Oryx dammah*), dama gazelle (*Gazella dama*), and

addax (*Addax nasomaculatus*).

Plaintiffs, the Exotic Wildlife Association, Charly Seale, Eddy

Blassingame, Terry Caffey, Ray Dockery, Joe Green, Nancy Green, Roy Leifester,

Thomas Oates, and Ed Valicek (collectively, Exotic Wildlife Ranchers), ask this

Court to preliminarily enjoin Defendants, the U.S. Department of the Interior,

Secretary of Interior, Ken Salazar, Director of the U.S. Fish and Wildlife Service,

Daniel Ashe, and the U.S. Fish and Wildlife Service (collectively, the Agency or

FWS), from enforcing a final rule FWS promulgated on January 5, 2012.  That

rule, if enforced on its effective date, April 4, 2012, will cause Exotic Wildlife

Ranchers to cease breeding and raising these magnificent animals on their

ranches—causing an irreparable, immediate, and precipitous decline in their

populations.

Although these three species are either extinct or nearly so in their native

Africa, they are thriving today on private ranches in the United States (primarily in

Texas).  But once the cumbersome new rule goes into effect on April 4, 2012,

imposing a complex and time-consuming permit system where FWS agents must

approve Exotic Wildlife Ranchers' management activities, it will bring exotic

antelope ranching to a swift conclusion—endangering the very animals that it is

supposed to protect.

The draconian effect of this new rule is easy to predict because since

publication of the proposed rule last summer, many owners have already disposed

of half[1] or all[2] of their oryx, addax and dama gazelles.  The market price of these

---

[1] Pls.' Ex. H, Joe Green Decl. ¶5.
[2] Pls.' Ex. K, Oates Decl. ¶2.

animals has dropped by at least half—probably more.[3]  Conversely the demand for

hunting sales has skyrocketed.[4]

Likewise, we know what will happen to these three species once the rule is

effective because this is exactly what happened with another exotic species listed

as endangered was subjected to the permitting scheme—the Barasingha deer.  As

Plaintiff, Nancy Green, states in her declaration, the permit requirement has made

the recovery of the Barasingha deer impossible:

> Because these Barasingha Deer were subject to the permitting
> requirements as soon as they were listed, we have to get a time
> consuming government permit and annual government approval to
> harvest a Barasingha for meat, trophy or cull.  We therefore bought
> only a few of these animals for our ranch simply to enjoy having
> them.  But since these animals don't pay for themselves, we do not
> want any more of them and we do not want them to reproduce on
> our ranch.  As it is, they take the place of other, more practical
> livestock.  If we could freely buy, sell, trade and harvest them, they
> would have a wonderful home and would be allowed to multiply
> further.  Since no one will buy them, and we no longer want them on
> our place, we were told by the government that our only option is to
> separate the males and females and let them attrite away.[5]

As Larry Johnson, president and owner of Safari Enterprises, L.L.C., states,

"the value of animals subject to the permit requirements controlled by FWS is

significantly less than those animals not subject to these permit requirements."[6]

And As FWS itself stated in 2005 when it exempted Exotic Wildlife Ranchers and

---

[3] *See* Pls.' Ex. E, Caffey Decl. ¶4; Pls.' Ex. G, Dockery Decl. ¶2; Pls.' Ex. J, Johnson Decl. ¶5; Pls.' Ex. K, Oates Decl. ¶3.
[4] *See* Pls.' Ex. E, Caffey Decl. ¶5; Pls.' Ex. K, Oates Decl. ¶5; Pls.' Ex. L Valicek Decl. ¶6.
[5] Pls.' Ex. I, Nancy Green Decl. ¶2.
[6] Pls.' Ex. J, Johnson Decl. ¶5.

the three antelope from this cumbersome regulatory system, the exemption from the permit requirements encourages the breeding of these species:

> The successful breeding of these three species in captivity in the United States has added significantly to the global populations of these species through increasing numbers of specimens available for reintroduction, maintaining genetic diversity, and conservation-related research.[7]

In fact, FWS also explained how the permit exemption provides an important economic incentive for the exotic wildlife managers:  "Not requiring each person to apply for a permit or authorization prior to engaging in these activities provides an important incentive to these operations to continue their captive-breeding and management programs,"[8] and that the permit program "does not provide the conservation benefits to the three antelope species that may be achieved by the proposed alternative" of exemption from the permit requirement.[9]

Finally, FWS's unaccountable reversal of position—and refusal to consider any other alternative to this cumbersome regulatory program—threatens imminent harm to the Exotic Wildlife Ranchers, whose entire investment in ranching these antelope will be destroyed once the new rule becomes effective.  In fact, that harm has already begun, as world-renowned conservation ecologist Dr. Pat Condy states:

> [T]he highly successful recovery results achieved by the Exotic Wildlife ranchers will all come to an end if there is no longer a

---

[7] Exclusion of U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions, 70 Fed. Reg. 52,310, 52,312 (Sep. 2, 2005).
[8] *Id.* at 52,313.
[9] Final Environmental Assessment, Proposed Rule; Exclusion of U.S. Captive-Bred Scimitar Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions at 13 (July 2005).

4

market force monetary incentive for these ranchers to keep hosting and breeding these species.  And that's exactly what this FWS rule means—no more economic incentive. And to these species, it means a rapid decline in numbers, a loss of genetic diversity, and likely extinction.[10]

So to maintain the status quo, and avoid further irreparable injury to these three species of magnificent creatures and Plaintiffs, Exotic Wildlife Ranchers therefore ask this Court to preliminarily enjoin FWS from enforcing or implementing this new rule pending final resolution of this case on its merits.

## ISSUES PRESENTED

1.   The survival of the three endangered antelope species depends entirely on the Exotic Wildlife Ranchers' game ranching operations.  But if the new rule goes into effect on April 4, most game ranching will cease, the numbers of antelope will decline, and the injury to the antelope and the ranchers will be irreparable.  Should this Court issue a preliminary injunction to maintain status quo pending final resolution of this case?

2.   Under the ESA, FWS is obliged to conserve and prevent species from becoming extinct, "whatever the cost."  Here, FWS has promulgated a rule that removes the economic incentive from private conservation efforts that prior to the new rule had resulted in thriving populations of three endangered antelope species in the United States.  Is this rulemaking likely to be arbitrary, capricious, and contrary to law under the Administrative Procedure Act?

3.   FWS contends that NEPA does not apply to this rule because the rulemaking is administrative and legal in nature.  But FWS's regulations specifically state that its exemptions to NEPA do not apply if the rulemaking will "[h]ave a significant impact on species listed" as endangered.  Is this rule, which destroys any economic incentive for ranchers to continue raising these endangered antelope, likely to require NEPA review?

---

[10] Pls.' Ex. F, Condy Decl. ¶10.

**FACTUAL BACKGROUND**

Decades ago the scimitar-horned oryx, addax, and dama gazelle were extirpated from their natural range in North Africa by wars, poaching, and population pressures.  Fortunately, a few foresighted livestock ranchers (primarily in Texas where the terrain and climate resemble North Africa) collected some of the remaining animals and began breeding them.  The animals thrived: populations of Texas-raised scimitar-horned oryx exploded from 32 in 1979 to 11,032 in 2010; addax from 2 specimens in 1971 to 5,112 in 2010; and dama gazelle from 9 individuals in 1979 to 894 in 2010.[11]

Today, Texas has more exotic wildlife than any other place on earth—over 250,000 animals from Africa, Asia, and Europe.[12]  The majority of these animals are raised on private property owned by Exotic Wildlife Ranchers.  FWS has recognized that captive breeding on private ranches, free of government regulation, has saved these three species from near extinction:

> Captive breeding in the United States has enhanced the propagation or survival of the scimitar-horned oryx, addax, and dama gazelle worldwide by rescuing these species from near extinction and providing the founder stock necessary for reintroduction. The scimitar-horned oryx is possibly extinct in the wild; therefore, but for captive breeding, the species might be extinct. Addax and dama gazelle occur in very low numbers in the wild, and a significant percentage of remaining specimens survive only in captivity (71% and 48%, respectively).[13]

---

[11] Pls.' Ex. C, Seale Decl. ¶6.

[12] 60 MINUTES:  CAN HUNTING ENDANGERED ANIMALS SAVE THE SPECIES? (CBS 2012) (available at http://www.cbsnews.com/8301-18560_162-57368000/can-hunting-endangered-animals-save-the-species).

[13] 70 Fed. Reg. at 52,310.

When FWS finally decided to add these three species to the endangered species list in 2005, it concurrently exempted them from the cumbersome permit procedure applicable to other listed endangered species (which lived in the wild and not on ranches).  FWS explained why this exemption was critical to the survival of these species:

> It was critical that development of a rule that provides an incentive to continue captive breeding of these species proceed concurrently with the determination of their legal status under the Act to ensure that no breeding programs would be disrupted by a final listing determination.[14]

## A.    The scimitar-horned oryx, dama gazelle, and addax

The three antelope species are not native to the United States.  They were introduced into this country from their native ranges in northern Africa.  All three species are extinct or near extinction in their home ranges:

> The best available information indicates that the causes of decline of these antelopes are (1) habitat loss through desertification, permanent human settlement, and competition with domestic livestock, and (2) regional military activity and uncontrolled killing. These threats have caused the possible extinction in the wild of the scimitar-horned oryx and the near-extinction of the addax in the wild.  All three species are in danger of extinction throughout their ranges.   Accordingly, we are listing these three antelopes as endangered.[15]

---

[14] *Id.* at 52,313.

[15] *Id.*

1.      **The scimitar-horned oryx**

Believed to be the source of the unicorn myth, the scimitar-horned oryx

(*Oryx dammah*) was historically found in the wild in Algeria, Burkina Faso, Chad,

Egypt, Libyan Arab Jamahiriya, Mali, Mauritania, Morocco, Niger, Nigeria,

Senegal, Sudan, Tunisia, and Western Sahara.[16]  The



scimitar-horned oryx stands about 47 inches (119

centimeters) tall and weighs around 450 pounds (204

kilograms).[17]  It is generally pale in color, but the neck and

chest are dark reddish brown.[18]  Adult scimitar-horned

oryxes possess a pair of horns curving back in an arc up to

50 in (127 cm) long.[19]  Scimitar-horned oryx have all but

disappeared from the wild.[20]  There were an estimated 500

scimitar-horned oryx in Chad and Niger until about 1985,

**Scimitar-horned Oryx
Photo by Jessie Cohen for the
Smithsonian National Zoo**

but by 1988, only a few dozen individuals survived in the

wild.[21]  Since then there have been no confirmed sightings in the wild.[22]

---

[16] IUCN SSC Antelope Specialist Group 2008, *Oryx dammah*, IUCN Red List of Threatened Species 2010.1 (2010), *available at* http://www.iucnredlist.org/apps/redlist/details/15568/0 [hereinafter "IUCN Red List"].

[17] Final Rule To List the Scimitar-Horned Oryx, Addax, and Dama Gazelle as Endangered, 70 Fed. Reg. 52,319 (Sept. 2, 2005).

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] IUCN Redlist, *Oryx dammah*, http://www.iucnredlist.org/apps/redlist/details/15568/0.

2.      **The addax**

The addax (*Addax nasomaculatus*) is generally about 42 inches (106 cm)

tall at the shoulder and weighs around 220 pounds (100 kg).[23] The addax has a

grayish white coat and its horns twist in a spiral up to 43 inches (109 cm) long.[24]

It was originally found in the wild in the desert or semi-desert habitats of the



Sahara and the Sahel regions of North

Africa.[25]  They were also originally

found in Chad, Mauritania, Niger,

Algeria, Egypt, Libyan Arab

Jamahiriya, Sudan, and Western

Sahara.  In fact, there were reports of

"immense herds" of addax north of

**Addax**
**Photo by Wildlife Archives**
**(http://www.wildlifearchives.com)**

Lake Chad in the 1920s.[26]

These populations dramatically declined after World War II in their native

range.  Drought and destruction of their native habitat contributed significantly to

the sharp decline of the addax.

3.      **The dama gazelle**

The dama gazelle (*Gazella dama*) stands about 39 inches (99 cm) tall at the

shoulder and weighs around 160 pounds (72 kg).[27]  The dama gazelle's upper

---

[23] 70 Fed. Reg. at 52,319.
[24] *Id.*
[25] *Id.*
[26] *Id.* at 52,321.
[27] *Id.*

body is mostly reddish brown, and its head, rump, and under parts are white.[28]  Its

horns curve back and up, but are generally less than half the length of those of the

scimitar-horned oryx.[29]  Their historic home range included Chad, Mali, Niger,

Libyan Arab Jamahiriya, Mauritania,

Morocco, Nigeria, Algeria, Tunisia,

Senegal, Sudan, and Western Sahara.[30]

They are believed to have disappeared

from North Africa but some remain in

Mali, Chad, and Niger.[31]  Some dama

gazelle are living in enclosed facilities in



**Dama Gazelle**
**Photo by Jungle Walk**
**(http://www.junglewalk.com)**

their home ranges in Morocco, Tunisia, and Senegal.[32]

**B.    The decision to list the three antelope species as endangered included a decision to exempt U.S. captive-bred populations from ESA requirements**

The 2005 rule listing the three antelope species as endangered identified no

danger to the captive-bred U.S. populations of the three antelopes.  To the

contrary, FWS stated that just the opposite is true—that U.S. captive breeding of

the species has stemmed the decline of the species and provided founders' stock

for eventual reintroduction:

> Captive breeding is a manmade factor that has stemmed the decline of
> the three species.  It has provided the founder stock necessary for

---

[28] *Id.*
[29] *Id.*
[30] IUCN Redlist, *Nanger dama*, http://www.iucnredlist.org/apps/redlist/details/8968/0.
[31] *Id.*
[32] *Id.*

reintroduction, maintenance of otherwise potentially lost bloodlines, and opportunities for research. The scimitar-horned oryx is possibly extinct in the wild and therefore, but for captive breeding, the species might be extinct. For addax and dama gazelle, they occur in very low numbers in the wild, and a significant percentage of remaining specimens survive only in captivity.[33]

Therefore, in recognition of the fact that U.S. captive-breeding represents the last, best hope for preventing these antelope species from becoming extinct, FWS exempted bona fide captive breeding programs from the cumbersome permit program applicable to other endangered species (most of which live in the wild and not on ranches), stating:

> [T]he Service may authorize otherwise prohibited activities that enhance the propagation or survival of the species, such as captive breeding to increase the population size or improve the gene pool, under section 10(a)(1)(A) of the Act.[34]

There is no question that FWS would have declined in 2005 to list the U.S. captive-bred populations of these three antelope species as endangered had it not believed that it had the authority to adopt a tandem rule treating those populations differently. For FWS understood that it was crucial that the listing of these three species not occur without providing a partial take exemption to provide incentives for the continued propagation and enhancement of the species:

> It was critical that development of a rule that provides an incentive to continue captive breeding of these species proceed concurrently with the determination of their legal status under the Act to ensure that no breeding programs would be disrupted by a final listing determination.[35]

---

[33] 70 Fed. Reg. at 52,322.
[34] *Id.* at 52,320.
[35] *Id.* at 52,313.

11

Thus, to allow the private conservation ranches to continue their success with the species, and to mitigate the impending harm that would arise from the listing, on the same date that it listed the species as endangered, FWS adopted a regulation that excluded U.S. captive-bred populations of the scimitar-horned oryx, dama gazelle, and addax from certain ESA take prohibitions:

> We are amending 50 CFR § 17.21 by adding a new paragraph (h), which will apply to U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle. The provision allows for the take; export or re-import; delivery, receipt, carrying, transport or shipment in interstate or foreign commerce, in the course of a commercial activity; or sale or offering for sale in interstate or foreign commerce of U.S. captive-bred live scimitar-horned oryx, addax, or dama gazelle, including embryos and gametes, and sport-hunted trophies, as long as certain criteria are met.[36]

## C.   Prior to the promulgation of the challenged rule in December 2011, the U.S. captive-bred populations of the three antelope were thriving and increasing in numbers

In 2004, Dr. Elizabeth Cary Mungall conducted research for the Exotic Wildlife Association to assess population numbers and habitat conditions for U.S. captive-bred populations of the three antelope species. Dr. Mungall reviewed a series of statewide censuses and collected data in a survey of Exotic Wildlife members who owned herds of one or more of the three species. Her research not only revealed significant numbers of each species on the ranches owned by Exotic Wildlife members, but also demonstrated remarkable increases in the populations of these three species on these ranches over a relatively short period of time:

---

[36] *Id.* at 52,317.

As shown by a series of statewide censuses (1966, 1971, 1974, 1979, 1984, 1988, 1994) in Texas done by the Texas Parks and Wildlife Department, the state wildlife agency, numbers of the three subject species kept in private ownership have been increasing.  This census series is further discussed in Mungall and Sheffield (1994).  To confirm the situation, a further census was done in 1996 at the request of the Exotic Wildlife Association (EWA) by the Texas Agricultural Statistics FWS.  Dama gazelle numbers were checked again in an October 2003 phone census done by the author for EWA as described in the next section.[37]

In summary, starting with the first census in which the species appeared:

- Scimitar-horned oryx:  32 in 1979 to 1,006 in 1994 to 2,145 in 1996.

- Dama gazelle:  9 in 1979 to 149 in 1994 to 91 in 1996 to 369 in 2003.

- Addax:  2 in 1971 to 587 in 1994 to 1,824 in 1996.[38]

Exotic Wildlife conducted an informal survey of its members in 2010 to update the data for the U.S. captive-bred populations of the three antelope species. Exotic Wildlife's survey reveals a several-fold increase in the populations of each of the three antelope species, including a 500% increase in scimitar-horned oryx:

- Scimitar-horned oryx:  11,032

- Dama gazelle:  894

- Addax:  5,112[39]

## D.    Litigation that resulted in the invalidation of the exemption rule

Certain animal-rights organizations challenged the tandem exemption rule for the three antelope species, and Exotic Wildlife intervened to assist FWS in

---

[37] Dr. Elizabeth Cary Mungall, SUBMISSION FOR THE COMMENT PERIOD ON PROPOSED LISTING OF SCIMITAR-HORNED ORYX, ADDAX, AND DAMA GAZELLE UNDER THE ENDANGERED SPECIES ACT:  A TECHNICAL REPORT FOR THE EXOTIC WILDLIFE ASSOCIATION 2 (2004).

defense of the rule in federal district courts in California and the District of Columbia.[40]  On June 22, 2009, the U.S. District Court for the District of Columbia ruled that the regulation violated the ESA because it allowed the take of species listed as endangered without the requirement for case-by-case permit applications and the commensurate public notice and comment opportunities.[41] The court remanded the matter to FWS for further proceedings consistent with the ruling, leaving it to FWS to promulgate new regulations that would not violate the ESA.[42]

**E.      FWS's final rule causes decline of the three African antelope species**

On remand, FWS chose to simply revoke the exemption, subjecting Exotic Wildlife Ranchers to the full force of a regulatory program that was never designed for the hoofstock that roamed and thrived on their private ranches, and that robs them of any economic incentive to continue to breed, feed, and care for these animals.  The rule reads:

> A person wishing to get a permit for an activity prohibited by § 17.21 submits an application for activities under this paragraph. The Service provides Form 3–200 for the application to which all of the following must be attained:
>
> (i) The common and scientific names of the species sought to the covered by the permit, as well as the number, age, and sex of such species, and the activity sought to be authorized (such as taking, exporting, selling in interstate commerce);

---

[38] *Id.*
[39] Seale Decl. ¶6.
[40] *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009); *Cary v. Hall*, 2006 U.S. Dist. LEXIS 78573 (N.D. Cal. Sept. 30, 2006).
[41] *Friends of Animals*, 626 F. Supp. 2d at 120.
[42] *Id.*

(ii) A statement as to whether, at the time of application, the wildlife sought to be covered by the permit (A) is still in the wild, (B) has already been removed from the wild, or (C) was born in captivity;

(iii) A resume of the applicant's attempts to obtain the wildlife sought to be covered by the permit in a manner which would not cause the death or removal from the wild of such wildlife;

(iv) If the wildlife sought to be covered by the permit has already been removed from the wild, the country and place where such removal occurred; if the wildlife sought to be covered by the permit was born in captivity, the country and place where such wildlife was born;

(v) A complete description and address of the institution or other facility where the wildlife sought to be covered by the permit will be used, displayed, or maintained;

(vi) If the applicant seeks to have live wildlife covered by the permit, a complete description, including photographs or diagrams, of the facilities to house and/or care for the wildlife and a resume of the experience of those person who will be caring for the wildlife;

(vii) A full statement of the reasons why the applicant is justified in obtaining a permit including the details of the activities sought to be authorized by the permit;

(viii) If the application is for the purpose of enhancement of propagation, a statement of the applicant's willingness to participate in a cooperative breeding program and to maintain or contribute data to a studbook;

(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a)(1) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in § 13.21(b) of this subchapter, the following factors:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

(3) Permit conditions. In addition to the general conditions set forth in Part 13 of this subchapter, every permit issued under this paragraph shall be subject to the special condition that the escape of living wildlife covered by the permit shall be immediately reported to the Service office designated in the permit.

(4) Duration of permits. The duration of permits issued under this paragraph shall be designated on the face of the permit.[43]

Copies of the permit applications are attached as Exhibits A and B.

The cost, the lengthy and uncertain permit process,[44] and risk that this cumbersome permitting process imposes on the Exotic Wildlife Association's members has already forced many of them to cut their stock of these endangered animals in half[45] or even to sell of their entire herd.

---

[43] 50 C.F.R. 17.22.
[44] Pls.' Ex. J, Johnson Decl. ¶3; Pls.' Ex. K, Oates Decl. ¶2.
[45] Pls.' Ex. H, Joe Green Decl. ¶5.

Exotic Wildlife members who have been raising and preserving these species for years have no choice but to reduce the size of their herds before the final rule takes effect, and they have done so:  Eddy Blassingame has dropped his herd from 80 animals down to 30;[46] Ray Dockery has reduced his herd from 200 to 52;[47] Joe and Nancy Green are in the process of reducing their herd by 50%;[48] Charly Seale reduced his herd from 23 to 6;[49] and Tommy Oates has sold off his entire herd.[50]  And while Exotic Wildlife members have been selling their antelope, other ranchers panicked by the impending FWS rule have dropped entire herds of oryx and addax off for liquidation at the exotic animal auctions.[51]  In the past year alone, the population of these already too-rare antelope has fallen 20 to 30 percent.[52]  If the final rule goes into effect, Charly Seale estimates that there will be virtually none of these antelope left in only ten years.[53]

## ARGUMENT

## I.   Standard of Review

FWS's actions are reviewed under the Administrative Procedure Act (APA),[54] which authorizes a court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

---

[46] Pls.' Ex. D, Pls.' Ex. D, Blassingame Decl. ¶3.
[47] Pls.' Ex. G, Dockery Decl. ¶2.
[48] Pls.' Ex. H, Joe Green Decl. ¶5.
[49] Pls.' Ex. C, Seale Decl. ¶11.
[50] Pls.' Ex. K, Oates Decl. ¶2.
[51] Pls.' Ex. K, Oates Decl. ¶4.
[52] Pls.' Ex. C, Seale Decl. ¶8.
[53] 60 MINUTES:  CAN HUNTING ENDANGERED ANIMALS SAVE THE SPECIES? (CBS 2012) (available at http://www.cbsnews.com/8301-18560_162-57368000/can-hunting-endangered-animals-save-the-species).

otherwise not in accordance with law."[55] "In exercising its narrowly defined duty

under the APA, a court must consider whether the agency acted within the scope

of its legal authority, whether the agency adequately explained its decision,

whether the agency based its decision on the facts in the record, and whether the

agency considered other relevant factors."[56]  Although FWS is entitled to

deference in its actions, "[t]he deference a court must accord an agency's scientific

or technical expertise is not unlimited . . . ."[57]  Indeed, the reviewing court should

not simply "rubber-stamp" the agency decision.[58]

## II.    Standard for granting preliminary injunctive relief

Preliminary injunctive relief is appropriate in this Circuit under Rule 65(a)

and (b) of the Federal Rules of Civil Procedure when four factors are established:

1.  There is a substantial likelihood of succeeding on the merits;

2.  Plaintiff will suffer irreparable harm if the injunction is not granted;

3.  Other interested parties will not suffer substantial harm if the
    injunction is granted; and,

4.  The public interest will be furthered by the injunction.[59]

As the D.C. Circuit and this Court have recognized, these four factors "interrelate

on a sliding scale . . ."[60] and "[i]f the arguments for one factor are particularly

---

[54] 5 U.S.C. §§ 501–04; 551–59; 571–584; 701–06.
[55] 5 U.S.C. § 706.
[56] *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997).
[57] *Id.*
[58] *See Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976).
[59] *See, e.g., Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Armstrong v. Bush*, 807 F. Supp. 816 (D.D.C. 1992); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205 (D.C. Cir. 1989); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841 (D.C. Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921 (D.C. Cir. 1958).

strong, an injunction may issue even if the arguments in other areas are rather weak."[61]  In this case, all four factors are met and preliminary injunctive relief is appropriate.

**A.**    **There is a substantial likelihood that Exotic Wildlife will succeed on the merits**

**1.**    **The challenged rule is arbitrary and capricious because there is no support in the record for the permitting scheme**

FWS asserts without pointing to any evidence in the record that it "does not believe that ranchers or other holders of these species that are working for the conservation of the species will reduce or eliminate their herds just because a permit or other authorization will now be required."[62]  FWS further states—again without citing to any support for this proposition in the record—that "[t]here should be no reduction in herds that were actually being used for conservation purposes."[63]

But the record here is chockfull of comments submitted by Plaintiffs, members of Exotic Wildlife who conserve the animals on their ranches, and other entities and individuals involved in the conservation of the animals, all stating the

---

[60] *Serona Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).
[61] *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. 1995).
[62] Removal of the Regulation That Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions,77 Fed. Reg. 433, 433 (Jan. 5, 2012).

same thing:  that these three species will soon disappear from the face of the earth

if the permitting scheme in the rule is imposed on the ranchers.  The final rule

states that 32 commenters "pointed out that intensive wildlife management by U.S.

ranchers is the reason the species exist today."[64]  The commenters expressed

concern that "removal of the exclusion that allows breeding and hunting of these

animals without a permit would impede private captive propagation of these

species."[65]  Commenters further expressed their belief that "[c]aptive groups of

these species would shrink, and, potentially, the species would be allowed to go

extinct."[66]  Finally, the commenters noted that the larger herds of the antelope that

currently exist today on the privately owned ranches provide "a larger and more

diverse gene pool, which allows some ranchers to contribute selected animals for

possible reintroduction to their natural environment."[67]

　　　　The closest FWS comes to addressing these comments is to acknowledge

that, well "[i]t is possible, however, that the number of ranches or private

individuals that currently maintain these species could reduce the size of their

herds or remove them from their property under the belief that maintaining them

would be an economic burden."[68]  Given that 32 commenters have told the

Agency that this is precisely what will happen, it is not only "possible," it is

---

[63] *Id.* at 433.
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*

inevitable.  That FWS simply ignored this evidence and promulgated the rule

anyway is plainly arbitrary and capricious.

>     **2.      The challenged rule is arbitrary and capricious because
>             FWS failed to consider alternatives to the
>             permitting scheme**

Not only did FWS impose an arbitrary, one-size-fits-all rule never meant to

apply to these ranchers, FWS also completely failed to consider any alternative to

the permitting scheme envisioned in the final rule.  That permitting scheme has

already proved unwieldy and uncertain.  As Larry Johnson, president of Safari

Enterprises, L.L.C., a business that raises endangered species using the permit

scheme at issue, states:

> First and foremost, the U.S. Fish and Wildlife Service does not issue
> the permits in the 90 days as they claim. It takes anywhere from 7–
> 10 months to obtain a permit for an endangered species. . . . Also, it
> is much more difficult than simply filling out a form to obtain a
> permit from the U.S. Fish and Wildlife Service. It's rather a lengthy
> process of supplying and supporting documentation, phone calls to
> the U.S. Fish and Wildlife Service, and ever-changing subjective
> requests depending on the biologist your permit happens to get
> assigned to. Despite recent statements in writing by the U.S. Fish
> and Wildlife Service, if an applicant does not have adequate
> experience with the species in the application or if the applicant does
> not supply supporting documentation exactly as FWS wants it, the
> permit will not be issued. Ironically, it is very difficult to get clear
> directions from FWS to meet their requirements.[69]

There is no reason why that permit process, mainly developed for zoos, should be

applied to the Exotic Wildlife Rancher.  The final rule states:

> [FWS] considered whether there were alternative means to comply
> with the Court's ruling without requiring ranches or other facilities

---

[69] Pls.' Ex. J, Johnson Decl. ¶¶3–4.

holding these species to obtain a permit or other authorization. However, [FWS] was unable to identify an alternative other than the currently established regulations at 50 CFR 17.21(g) and 17.22— providing for the registration of captive-bred wildlife or issuance of a permit—that would provide the public an opportunity to comment on proposed activities being carried out with these species. In addition, the Service did not receive any comments or suggestions from the public that presented a viable alternative.[70]

But it is simply not true that FWS did not receive any comments or suggestions from the public that presented a viable alternative, and it was again plainly arbitrary and capricious for FWS to state otherwise and to ignore these alternatives in the rulemaking.

The record also shows there were extensive comments on the permitting scheme in the final rule consistent with the district court's conclusion that the public must be given an opportunity to comment on proposed activities.  In invalidating the rule that exempted the three listed species from the permitting regime, the district court held that the blanket exception violated Section 10(c) of the ESA because it did not provide for the notice-and-comment that Section 10(c) requires.  But Section 10(c) does not comprehensively address the procedure and content of permits, nor did the district court judge require FWS to promulgate any specific rule other than one that was consistent with Section 10(c).

One commenter, Conservation Force, provided FWS with extensive and detailed modifications to the permit process that should apply to the three antelope species, consistent with the district court's notice and comment requirements:

_____

[70] *Id.* at 432.

Joint Applications and Permits:

Both captive-bred and cull applications and permits should be combined (consolidated or merged into one) as one application and one permit. One joint application and one permit would reduce the cost, confusion, duplicative information, etc. Perhaps it could be titled "Captive Game Ranching and Culling Permit *for ....*" Most of the information in the two applications is the same. Tracking the renewal of two different permits with different renewal dates commonly causes permits to lapse. One permit can and should serve both purposes, particularly since the FWS previously determined no application or permit was required. The informational notice and opportunity for public comment would be the same.

Create Grace Period:

A grace period of 60 days should be created to reduce the threat of unintended permit expirations. Renewal applications should be considered 60 days after permits expire, i.e. the existing permit or permits should continue in effect if a renewal is filed within 60 days of the expiration of the permit or permits. There are few things more onerous than having to start the renewal process all over again because a permit has expired. Sending notice of expiration on or before expiration would also support the enhancement.

Explicit Purpose Permit Applications:

Captive-bred and cull permits should be made specific for this type of exotic game ranching and be plainly titled. The current application forms are confusing and unnecessarily complex because many of the questions don't relate to the type and kind of ranching/exotic captive breeding in issue. It is common for applicants to complete sections not relevant or to respond "not applicable" to questions the FWS intended to be answered. The forms are tedious, duplicative and confusing to professionals, much less lay ranchers.

Real-Time Application Process:

Permit application procedures need to be available for completion in real-time on the internet.

State Management:

These species can have a huge impact on habitat and compete with native wildlife. Allowance has to be made for State authorities to manage and control the three antelope on public land and throughout the state. Perhaps the whole process needs to be delegated to responsible State authorities on an elective basis.

Longer Term Permits:

Current captive-bred permits are three years in duration but cull permits must be renewed annually. This has proven to be confusing and hard to track and administer by ranchers. It can take six or more months to get a cull permit, then a renewal application must be received by the Service more than 30 days before expiration. That means the renewal application must be prepared in the 11th month to file before the 11h month commences, even though the rancher did not receive it until the 6th or 7th month after it was effective. Additionally, an Annual Report must be filed. All could and should be lengthened. The term of duration of the cull permits should be no less than those for captive breeding, three years, and both could be five years. That alternative would procedurally satisfy the Court (contrary to no permit or publication at all) reduce the burden and encourage the captive ranching. It would be fully consistent with the prior rule and its rationale, which is unchanged. ("[t]he rule provides an incentive to continue captive breeding" pg. 52316). It has already been soundly determined that the object should be to reduce the burden of permitting on the rancher breeders. The new regulation, as proposed, does not accomplish that purpose. It is a return in total to a system that is in and of itself a disincentive. It is inconsistent with the sound reasoning expressed in the initial exemption rule.

Renewal:

There is confusion whether an existing permit stays in effect if a renewal for a permit is filed before the passage of its stated termination date or does so only if received by FWS 30 or more days before the stated expiration. This needs to be unambiguously clarified and uniformly represented. Second, sending a notice of expiration 15 days in advance would help maintain communications, alert the permit holder and help maintain the

> permits that have been determined to be of benefit. Since the ranching enhances the three species, the result warrants the warning notice.[71]

There is nothing in the record that indicates that FWS even read any of these suggestions.

Conservation Force's comments also explain how the sport hunting of these captive-bred animals generated significant revenue used to enhance the survival of the species and helped to maintain a healthy herd by managing excessive growth:

> The Court upheld the USF&WS position that the game ranching constituted enhancement even though the regulation no longer required the payment of revenue to *in situ* projects, i.e. contributions to projects in the country or countries of origin. The sport hunting of captive-bred animals generated necessary revenue to support the operations, relieved pressure on wild populations and was an ordinary and necessary husbandry practice to manage excess growth. Plaintiffs' attacks on that finding were dismissed; consequently, that component of the special exemption should not be discarded.
>
> . . .
>
> The new regulation should incorporate the enhancement finding that survived the court case. It should eliminate the requirement that there be a payment of 5% or more of the gross proceeds from the hunting to a project in the country of origin. This should be not only because the Court denied the plaintiffs' attack on that enhancement finding, but because of the historic problems of the direct contribution requirement.[72]

Further, Kathryn Kyle, who is a rancher and member of the Exotic Wildlife Association, submitted in her comments the following specific objections to the proposed permitting process in the rule, and proposed the following alternatives:

---

[71] Letter from Conservation Force to U.S. Fish and Wildlife Service (Aug. 4, 2011), *available at* http://www.regulations.gov/#!documentDetail;D=FWS-R9-IA-2010-0056-0049.
[72] *Id.*

- The turnaround time for initial permits must be reduced. The permits must be no more than a 90-day turnaround time, not the current close to a year or better turn-around time;

- The issuance of a permit needs to become a "rubber stamp" process. If an application is received and is in order, the permit should be issued;

. . .

- The cull and take permits for these three species must be for either sex as both sexes can be and are taken as trophies;

- The permits both the captive breeder and cull and take need to be for at least 3 years, 5 would be better;

- The turn-around time for renewal of both permits should be less than 45 days from receipt of the renewal application in the FWS office, not the several months that is currently the case;

- The current percentage of money received from taking of the animals must be eliminated, as it is the ranches whose pocket the money comes out of that are propagating the species not programs, if there are any in their native country;

- Understand that ranches are not zoos, and there is no way that ranchers can know the exact number of births and deaths or the cause of death of every animal.  For example, her herd of addax lives in a 2,200-acre pasture of varied terrain typical of the Texas Hill country. How many births and deaths have occurred since they last counted the animals can only be estimated, since the animals are not seen daily and certainly, addax can die without the ranchers finding them.  If we see a young calf, we record that and if we find one dead, we record that.[73]

FWS did not provide any response to her concerns or suggestions in its final

rulemaking.

---

[73] Letter from Kathryn Kyle to U.S. Fishs and Wildlife Service (July 24, 2011), *available at* http://www.regulations.gov/#!documentDetail;D=FWS-R9-IA-2010-0056-0027 (paragraph numbers omitted).

The Texas Wildlife Association urged FWS in its comments to adopt a stream-lined permit procedure in its final rule, pointing out that if the permit were tailored to the specific realities of the ranchers, the permit process could work and satisfy notice and comment requirements of Section 10(c):

> TWA strongly supports the rapid development and use of reasonable, real-time (or nearly so) electronic internet-based application, approval and permitting processes for these and other species, allowing real time management options for landowners and hunters that do have to deal with these species, and the native wildlife and habitat interactions. Real-time electronic internet-based permitting for individual animals under the proposed rule-making, especially with suggested recommendations, would enhance the situation for the Service, the landowner and the hunters. . . . We also recommend that when properties enter severe, extreme or exceptional drought that additional harvest protocols and emergency response be addressed and enacted for harvest response within plans on specific sites. In addition, both captive-bred and cull applications and permits should be combined (consolidated or merged into one) as one permit. Conservation Force suggests one joint application and one permit would reduce the cost, confusion, duplicative information, etc. Most of the information in the two applications is the same. Tracking the renewal of two different permits with different renewal dates commonly causes permits to lapse. One permit can and should serve both purposes, particularly since the FWS previously determined no application or permit was required. The informational notice and opportunity for public comment would be the same. Finally, current captive-bred permits are three years in duration but cull permits must be renewed annually. Additionally, an Annual Report must be filed. All could and should be lengthened. The term of duration of the cull permits should be no less than those for captive breeding, three years, and both could be five years.
>
> . . .
>
> TWA opposes the reassessment of the *in situ* funding requirement for ranches outside of the direction of the AZA. The previous permit had eliminated the need to annually contribute and document five percent (5%) or more of the gross revenue to acceptable *in situ* projects. It is our understanding that he District Court dismissed all

claims that the ranching constitutes enhancement of both the survival and propagation of the three species without the additional *in situ* project finding.  Thus the *in situ* funding should not be implemented in the rule.[74]

Exotic Wildlife Association member, Michael Simpson, confirmed in his comments that a streamlined permit could be acceptable to the ranchers:

> If a very simple permit "was" designed with ease of applications and in effect for minimum of five year this might possibly be accepted by the industry.[75]

Safari Club International explained in their comments that the rancher is a business owner, and the permitting scheme must allow for prompt review the permit applications.  In addition, the Safari Club called on FWS to include in the rule protections for the ranchers from those opposed to any lawful herd management activities, including hunting:

> A rancher cannot run a cost-effective business involving one or more of these species, if he or she is not sure if and when the Service will act on his or her request for permit authority.  To remedy this uncertainty and relieve the Service of some of the weight of responsibility that this new permit process may bring, the Service should commit to acting on permit applications within 60 days of receiving the application.  The process should also include a provision establishing that if the Service fails to meet its 60 day deadline, the permit will be deemed granted.
>
> Any new regulations promulgated pertaining to the trade and take of these three antelope species should include penalties for those who harass the ranchers and owners of these herds, as well as the hunters who hunt on these ranches.  The permit application process and its public notice requirement potentially expose permit applicants to unnecessary public scrutiny.  Many of those who seek information

---

[74] Letter from Texas Wildlife Association to Robert Gabel (Aug. 1, 2011), *available at* http://www.regulations.gov/#!documentDetail;D=FWS-R9-IA-2010-0056-0084.
[75] Letter from Forrest Michael Simpson to U.S. Fish and Wildlife (Aug. 3, 2011), *available at* http://www.regulations.gov/#!documentDetail;D=FWS-R9-IA-2010-0056-0097.

about ESA enhancement of survival permit applications for these three species philosophically oppose the sustainable use conservation that has led to the successful U.S. recovery of scimitar-horned oryx, dama gazelle and addax.  Unfortunately, a few of those opponents have, from time to time, taken it upon themselves to attempt to interfere with and otherwise harass the ranchers and hunters engaged in these sustainable use activities.[76]

Finally, the Association of Zoos and Aquariums expressed support for a permitting scheme that would allow for international movement of the animals:

> AZA suggests a provision which would allow AZA institutions to engage in the time-sensitive international movement of these animals for non-commercial purposes such as breeding loans for public display or reintroduction purposes without the constraints of additional permit authorizations and other logistical procedures.[77]

In short, the record contains numerous suggestions and thoughtful explanations for a variety of alternatives to one-size-fits all permitting scheme chosen by FWS in the rulemaking.  But FWS steadfastly ignored all of these comments and alternatives, leaving no room whatsoever for the unique role that the ranchers play in conserving these endangered antelope.  Indeed, FWS's only response to these alternatives were "outside the scope of the District Court's ruling that the blanket exemption violated the notice-and-comment requirements of Section 10(c) of the ESA."[78]  But that response only demonstrates that FWS did not really consider the alternatives at all, since even a cursory reading of the

---

[76] Letter from Safari Club International and Safari Club International Foundation to U.S. Fish and Wildlife (Aug. 8, 2011), *available at* http://www.regulations.gov/#!documentDetail;D=FWS-R9-IA-2010-0056-0082.

[77] Letter from the Association of Zoos and Aquariums to U.S. Fish and Wildlife (Aug. 1, 2011), *available at* http://www.regulations.gov/#!documentDetail;D=FWS-R9-IA-2010-0056-0054.

[78] 77 Fed. Reg. at 434.

suggestions show that the commenters recognized the importance of complying with Section 10(c).

Therefore, because FWS failed to consider these alternatives, the rule is arbitrary and capricious and contrary to law.

### 3. The challenged rule is arbitrary and capricious because FWS failed to consider delisting the U.S. captive-bred populations

For no reason at all FWS refused to consider removing the three species from the endangered species list—even though they would not have been listed without the tandem exemption rule back in 2005—stating that "[t]hese comments are outside the scope of this rulemaking because they do not address the Court's ruling that 50 CFR 17.21(h) violates section 10(c) of the Act . . . ."[79]  Given the extraordinary growth in their populations, the captive-bred African antelope on Exotic Wildlife Ranchers' properties hardly qualify as "endangered"—at least before this rule was published.  They qualify as successful herds of hoofstock that should be recognized as such.

FWS completely fails to explain its current position, stated in the final rule, that "[t]hese comments are outside the scope of this rulemaking,"[80] when only a few years ago FWS stated the opposite—that the tandem promulgation of the listing rule and the exemption rule was critical:

> It was critical that development of a rule that provides an incentive to continue captive breeding of these species proceed concurrently with the determination of their legal status under the Act to ensure

---

[79] 77 Fed. Reg. at 436.
[80] *Id.*

30

that no breeding programs would be disrupted by a final listing determination.[81]

FWS has offered no explanation why what was true then—that the captive breeding of these antelope should not be subject to cumbersome permit requirements—is somehow not true now.

### 4. The challenged rule is contrary to law because it destroys rather than conserves the species as required by the ESA

The Endangered Species Act mandates that Fish and Wildlife must not take any action that harms or jeopardizes a species.[82]  Jeopardize includes any action that makes recovery of the endangered species remote.[83]  Because the final rule will prevent continued conservation and recovery of these species of endangered antelope, the rule is contrary to law.

Under the ESA, conservation is broadly defined as:

[T]he use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.[84]

---

[81] 70 Fed. Reg. at 52,313.
[82] 16 U.S.C. § 1536(a)(2).
[83] *San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F. Supp. 2d 855, 870 (E.D. Cal. 2010).
[84] 16 U.S.C. § 1532(3).

The ESA requires the Secretary "to conserve threatened and endangered species to the extent that they are no longer threatened or endangered."[85]

Likewise, Section 7(a)(2) of the ESA[86] requires that each agency ensure that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species . . . ."[87] Regulations issued by FWS further explain that "jeopardize" "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[88] This includes action that keeps recovery "far out of reach" and only provides for the species' continued survival.[89]

Here, these three species of antelope are listed as endangered. Therefore, under its own regulations, FWS is required to take steps to conserve the antelope until the antelope are no longer endangered or threatened. Since the ultimate goal of the ESA is for species to be removed from the endangered or threatened lists because of recovery, action that limits (or prevents) the endangered antelope populations from recovering is contrary to the requirements of the ESA.

The permitting process required in this rulemaking will make the conservation efforts of these private ranchers economically impossible. In fact,

---

[85] *Carson-Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 261 (9th Cir. 1984) (*citing TVA v. Hill*, 137 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost.")).

[86] These requirements, although part of the Section 7 consultation process, are also directly applicable to FWS through Section 2. *See Defenders of Wildlife v. DOI*, 354 F. Supp.2d 1156, 1173–74 (D. Or. 2005).

[87] 16 U.S.C. § 1536(a)(2).

[88] 50 C.F.R. § 402.02.

[89] *San Luis & Delta-Mendota Water Auth.*, 760 F. Supp. 2d at 870.

since this rule was published for notice and comment on January 5, 2012, many ranchers have begun dramatically reducing the size of their herds, either by selling live animals or by selling more rights to hunt the antelope.   In addition, the ranchers have not bred the animals.  Eddy Blassingame has reduced his herd from 80 to 30;[90] Ray Dockery has reduced his herd from 200 to 52;[91] Joe and Nancy Green have reduced their herd by half;[92] Charly Seale has reduced his herd from 23 to 6.[93]  Tommy Oates has sold off his entire herd.[94]

That is because the permitting process has changed raising these animals from an enterprise to a liability.[95]  Ranchers who had hoped to pass along their herds of endangered species to their children and grandchildren now have no choice but to get rid of the animals.[96]  Although the overwhelming majority have been doing so by trying to sell off their animals, Charly Seale reports that some owners of these antelope have simply abandoned them:  "I have also had reports of small herds of oryx free-roaming. While some species might be inclined to escape, oryx are not like that. They are home bodies. Free roaming herds are an indication that they have been intentionally released."[97]

The permitting process will also result in a reduction of the reproduction, numbers, and distribution of the antelope.  Smaller herds mean less genetic

---

[90] Pls.' Ex. D, Blassingame Decl. ¶3.
[91] Pls.' Ex. G, Dockery Decl. ¶2.
[92] Pls.' Ex. H, Joe Green Decl. ¶5.
[93] Pls.' Ex. C, Seale Decl. ¶11.
[94] Pls.' Ex. K, Oates Decl. ¶2.
[95] Pls.' Ex. D, Blassingame Decl. ¶2.
[96] *See id.*
[97] Pls.' Ex. C, Seale Decl. ¶8.

diversity among the herd, and so less sustainable breeding.  Likewise, the decrease

in breeding, the (temporary) increase in hunting, and the long-term decrease in any

incentive to maintain herds of these antelope will reduce their numbers.  The

decrease in genetic diversity will also ultimately reduce the sustainable

population size.

That FWS was obligated under the ESA to ensure the conservation of these

three species of endangered antelope but did not do so renders this rulemaking

plainly contrary to law.

> 5.   **The challenged rule is contrary to law because FWS failed to consider the environmental impacts as required by NEPA**

Section 102(2)(C) of the National Environmental Policy Act (NEPA)

mandates that proposals for "major federal actions significantly affecting the

quality of the human environment" must be accompanied by a detailed

Environmental Impact Statement (EIS).[98]  All federal actions involving

"unresolved conflicts concerning alternative uses of available resources" must be

preceded by an agency effort to develop alternatives.[99]

On January 5, 2012, FWS circumvented compliance with these

requirements, claiming that the rulemaking in this case was "administrative" and

"legal" in nature, and required by the district court's invalidation of an earlier

rule.[100]  As previously explained in this Memorandum, FWS also ignored

---

[98] 42 U.S.C. § 4332.
[99] *Id.*
[100] 77 Fed. Reg. at 437.

alternatives that could have preserved the status quo by adopting permitting requirements that accommodated the ranchers' conservation efforts or by delisting the three antelope species and eliminating any need for permits.

There is nothing in the rulemaking explaining FWS's claim that its rulemaking is for "administrative" or "legal" reasons, other than the conclusory, sparse statement to this effect.[101]  These conclusory statements hardly satisfy the requirement that an agency comply with NEPA "to the fullest extent possible."[102]  Likewise, to the extent that FWS believes that this rulemaking is exempt from NEPA compliance, in this Circuit exemptions are narrowly construed.[103]

And here, the Agency's own regulations remove any possibility that this rulemaking could be exempt from NEPA compliance.  The rule is not exempt because exemptions cannot apply to decision that have a significant impact on endangered species.  The CFR exception is:

> The following actions are categorically excluded under paragraph 46.205(b), unless any of the extraordinary circumstances in section 46.215 apply:
>
> . . .
>
> (i) Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.[104]

---

[101] *Id.*
[102] 42 U.S.C. § 4332.
[103]  *Calvert Cliffs Coordinating Committee v. U.S. Atomic Energy Commission*, 449 F.2d 1109, 1115 (D.C. Cir. 1971).
[104] 43 C.F.R. § 46.210

The "exceptions to the exception" listed at 43 C.F.R. § 46.215 include actions that:

> (h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.[105]

FWS's conclusory assertion that the change is simply a legal change is not supported by the record, and is further contradicted by FWS's earlier position with regards to the permits, and not sufficiently reasoned to allow FWS to apply the exclusion.[106] "Defendants' failure to apply the correct standard by which to consider environmental impacts . . . is sufficient by itself to render the DOI's decision to invoke a categorical exclusion arbitrary and capricious."[107]

Finally, in *Sierra Club v. Peterson*,[108] the D.C. Circuit held that if an agency decided to forego NEPA compliance, the agency should take a "hard look" at the relevant areas of environmental concern, and whether in so doing determine if the agency had made a convincing case that the impact was insignificant, and whether the agency convincingly established that proposed changes reduced the impact to a minimum.[109]

Plainly, FWS's considerations of the impacts that the permitting requirements would have on these endangered species fell far short of the *Petersen*

---

[105] 43 C.F.R. § 46.215

[106] *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp.2d 1, 15–20 (D.D.C. 2009).
[107] *Id.* at 17.
[108] 717 F.2d 1409 (D.C. Cir. 1983)
[109] *Id.* at 1413.

standard.  For example, FWS never countered the ranchers' contentions that they would not be able to comply with all of the permitting requirements and continue to afford to conserve the animals on their ranches.  To the contrary, FWS simply said that it did not believe that the ranchers.[110]  The rulemaking does not demonstrate that FWS took a hard look at the problem the permitting requirement will create nor does it make convincing showing that the impact of the permitting requirement in the challenged rule will be anything other than devastating for the endangered antelope.

Likewise, the rulemaking does not demonstrate that FWS made any meaningful consideration or discussion of alternatives to the permitting scheme contained in the rule promulgated by FWS.  NEPA specifically requires all federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[.]"[111]  The consideration of alternatives is independent of the duty to prepare an EIS.[112]  When no EIS is prepared, the analysis must still be presented in an Environmental Assessment.[113]

In short, FWS was required under NEPA to engage in "intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely

---

[110] *See* 77 Fed. Reg. at 433.
[111] 42 U.S.C. § 4332 (2)(E).
[112] *Trinity Episcopal School Corp. v. Romney*, 523 F.2d 88, 93 (2d Cir. 1975).
[113] 40 C.F.R. § 1508.9(b).

different means."[114]   Here, several alternatives were available to FWS that would

have allowed these antelope to continue to thrive on the private game ranches.

But there is no showing that FWS carefully considered these alternatives in this

rulemaking.   Therefore, this rulemaking in arbitrary, capricious, and contrary to

the requirements of NEPA.

> **B.      Harm to the respective parties:  Exotic Wildlife—and the three
>           antelope species—will suffer irreparable harm if the injunction
>           is not granted**

        In determining a Motion for Preliminary Injunction, the court looks to the

respective hardships to the parties if the injunction is granted or, alternatively, if it

is denied.[115]   Here, this issue falls most squarely on the endangered animals whose

very existence depend on the ability of the ranchers—members of Exotic

Wildlife—to continue their game ranching operations.   The hardship to these

endangered animals from the abrupt end to the conservation efforts that have been

so successful is substantial, to the point of being unconscionable.   This enormous

and irreparable injury to Exotic Wildlife and to the three species of endangered

antelope justifies issuance of the preliminary injunction in this case.

        As stated by world-renowned conservation ecologist Dr. Pat Condy:

> [T]he highly successful recovery results achieved by the Exotic
> Wildlife ranchers will all come to an end if there is no longer a
> market force monetary incentive for these ranchers to keep hosting
> and breeding these species.   And that's exactly what this FWS rule
> means—no more economic incentive. And to these species, it means

---

[114] *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974).

[115] *See, e.g., Mova Pharmaceuticals Corp.*, 140 F.3d at 1066; *Armstrong*, 807 F. Supp. 816.

a rapid decline in numbers, a loss of genetic diversity, and likely extinction.[116]

This imminent and irreparable harm to these species is demonstrated through the extensive testimony of the Exotic Wildlife Ranchers who find themselves forced to drastically reduce their herds, or eliminate them entirely, as a direct result of the FWS permit requirements that make it financially impossible to raise, breed, manage and conserve these species.  Unlike the traditional endangered species case, here, economics is on the same side as species conservation.  What is good for the species is good for the economic interests of the ranchers.  But the reverse is also true and when there is a financial decline, there is a species decline.

For instance, Ed Valicek has reduced his herd from between 75-100 animals, to 47 because of the FWS rule, and plans to sell off the remainder of his herd if the rule is not eliminated.[117]  Ed Valicek explained that due the FWS permitting requirement, the prices for live sales of juvenile oryx and addax has dropped by more than 50%.[118]  These are the "animals used to introduce new genetic material and prevent inbreeding" of populations.[119]  In fact, Tommy Oates has observed a 50% reduction in the price for juvenile oryx and addax just between the January and February 2012 exotic animal auctions.[120]  Juveniles are

---

[116] Pls.' Ex. F, Condy Decl. ¶10.
[117] Pls.' Ex. L Valicek Decl. ¶3,5.
[118] Id. ¶4.
[119] Id.
[120] Pls.' Ex. K, Oates Decl. ¶5.

not the only animals to lose their value, with all live sales of oryx and addax dropping by half or more.[121]

Likewise, Eddy Blassingame has dropped his herd from 80 animals down to 30;[122] Ray Dockery has reduced his herd from 200 to 52;[123] Joe and Nancy Green are in the process of reducing their herd by 50%;[124] Charly Seale reduced his herd from 23 to 6; and Thomas Oates has sold off his entire herd.[125] Additionally, ranchers panicked by the impending FWS rule, have dropped their entire herds of oryx and addax off for liquidation at the exotic animal auctions.[126]

Reductions in herds are not surprising when you consider the harm to the Exotic Wildlife Ranchers.  As Dr. Pat Condy states, FWS's rule forces ranchers out of the business of conservation:

> This FWS rule changes the forces of the market place, such that they get out of sync with the forces of nature. Not simply does this seriously jeopardize the very survival of these species, but it is also greatly demoralizing to the voluntary participation of private landowners in endangered species conservation of exotic and/or native wildlife species.[127]

For instance, Eddy Blassingame, bought his exotic animal ranch and started breeding scimitar-horned oryx with the dream of passing along something to his children and grandchildren.[128]  But with the permitting requirements and the resulting impact on the values of the animals and the ranch as a whole, he now

---

[121] *See* Pls.' Ex. D, Blassingame Decl. ¶4; Pls.' Ex. E, Caffey Decl. ¶4; Pls.' Ex. G, Dockery Decl. ¶2.
[122] Pls.' Ex. D, Blassingame Decl. ¶3.
[123] Pls.' Ex. G, Dockery Decl. ¶2.
[124] Pls.' Ex. H, Joe Green Decl. ¶5.
[125] Pls.' Ex. K, Oates Decl. ¶2.
[126] Pls.' Ex. K, Oates Decl. ¶4.
[127] Pls.' Ex. F, Condy Decl. ¶14.

sees it as more of liability.[129]   Under the FWS permit requirements, it is not

possible for Exotic Wildlife Ranchers to even cover their costs for these

animals.[130]   Ranchers will be forced to stop raising and trading in these antelope.

Terry Caffey makes his living brokering live sales of these antelope and consulting

for ranches who raise these species.  Caffey believes that the FWS rules will

directly result in a loss of personal income of over $100,000 because the ranchers

he works with will be going out of the business and will have no sales for him to

broker. [131]   This is a substantial injury to the Exotic Wildlife Ranchers and well as

the antelope.

These drastic reductions in herds are not isolated to a few individuals, but

are reflected throughout the entire community of Exotic Wildlife Ranchers.  Over

the past year, there has already been at least a 20-30% reduction in the population

of these three species as a direct result of the FWS proposed, now final rule.[132]

And that's only in one year.  Few plagues have proved as lethal to a species as the

FWS final rule.  As stated by Executive Director of the Exotic Wildlife

Association, Charly Seale:  "This FWS Rule will reverse the single greatest

endangered species conservation success story, and turn into the greatest failure.

It seems hard to believe that a permit could cause a species to go extinct, but that's

---

[128] Blassingame ¶2.
[129] *Id.*
[130] *See* Pls.' Ex. D, Blassingame Decl. ¶¶4-5.
[131] Pls.' Ex. E, Caffey Decl. ¶4.
[132] See Pls.' Ex. C, Seale Decl. ¶8; Pls.' Ex. K, Oates Decl. ¶4.

exactly what could happen here.  That is what will happen here if we don't do
something to stop this."[133]

Further, the FWS rule has resulted in a rush on hunting these three antelope
species.  While the market has dropped out for the Exotic Wildlife Ranchers who
wish to breed, raise, conserve, and have "live sales" of these species, the same
cannot be said for those wishing to hunt these species.  In fact, the FWS rule has
caused an explosion of hunting before the rule goes into effect.[134]

The elimination of the captive-bred populations in the United States will
also halt efforts to reintroduce these species in their native lands.  The Exotic
Wildlife Association has been working with partner group Sahara Conservation
Fund to reintroduce oryx and addax to Senegal.[135]  But without the genetic stock
available to provide the animals for reintroduction, this conservation effort will die
out along with any hope for these species.[136]

Sadly, this has already happened with a closely-related species, the Arabian
oryx.  Listed as an endangered species in the 1970's, the Arabian oryx has long
been subject to the same permitting requirements and restrictions that will be
imposed by the final rule.[137]  There were more than 1,500 Arabian oryx in the
United States when they were listed; today, there are less than 250.[138]

---

[133] Pls.' Ex. C, Seale Decl. ¶14.
[134] Pls.' Ex. L Valicek Decl. ¶6; Pls.' Ex. K, Oates Decl. ¶5; Pls.' Ex. E, Caffey Decl. ¶5.
[135] Pls.' Ex. C, Seale Decl. ¶12.
[136] *Id.*
[137] Pls.' Ex. J, Johnson Decl. ¶7.
[138] *Id.*

In contrast, FWS will suffer no injury at all.  FWS's interest must be the continued success of these three species.  And the species have thrived up until to now—without a permit requirement.  A preliminary injunction, pending resolution of the validity of FWS's new permit rule, helps the species—and so aids, not injures, FWS.

In short, the balance of hardships tips heavily in favor of the Exotic Wildlife Ranchers and the preliminary injunction must be granted to prevent the irreparable injury to these endangered species and the Exotic Wildlife Ranchers who seek to conserve them.

## C.    The public interest will be furthered by the injunction

There is no question that protection of these three endangered antelope species is a matter of great public interest.[139] "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities."[140]  And, significantly, the furtherance of that public interest has been delegated by Congress under the Endangered Species Act to Defendants in this case—the Secretary of the U.S. Department of the Interior, and the U.S. Fish and Wildlife Service.[141]

The effect on the population of these rare antelope has already been discussed—the permitting requirement will result in the loss of these species.  But this is not the end of the story.  These antelope have thrived in Texas because—

---

[139] *See Tennessee Valley Auth. v. Hill*, 437 U.S. at 194.
[140] *Id.*
[141] 16 U.S.C. § 1533.

43

unlike other endangered species subject to the permit process—they are able to pay their way.[142]  Exotic wildlife ranching in Texas alone is a $1.3 billion industry that has created 14,000 jobs.[143]  The permit requirement threatens to extinguish both the antelope and that industry.

Yet, FWS by this rulemaking has failed to perform its congressionally mandated role to conserve these endangered antelope and prevent their extinction. FWS has acted arbitrarily and capriciously and contrary to law in carrying out its delegated duty to the endangered species and to the public. Therefore, the public interest in this case favors the issuance of the requested injunction.

## CONCLUSION

On April 4, 2012 FWS's final rule goes into effect.  At that point these three antelope species will be subject to all of the permitting requirements under the federal Endangered Species Act.   Unless this Court enjoins the enforcement of this rule, Plaintiffs, Exotic Wildlife Ranchers, will not continue to maintain these animals.  In fact, since the publication of the rule in January 2012, populations of these animals are already sharply declining.  The ranchers simply cannot afford to maintain the animals under a one-size-fits-all permitting scheme required under the rule.

In this case, the interests in the economics of maintaining the animals on private game ranches and the preservation of the species are identical.  Plaintiffs,

---

[142] Pls.' Ex. I, Nancy Green Decl. ¶¶1–2.
[143] Pls.' Ex. C, Seale Decl. ¶4.

members of the Exotic Wildlife Association (along with zoos), are the conservationists responsible for the care of these animals, and have through their own efforts achieved the large numbers of animals that today exist on their ranches.  Exotic Wildlife is here in this Court as a last-ditch effort to avoid seeing these magnificent animals lost forever.

Under the status quo, these animals are thriving.  This Court should preserve the status quo unless the Court can be sure that the animals will not become extinct once the rule goes into effect.  Failure to do so "could result in irreparable harm to a threatened species. Those are precisely the circumstances in which . . .  precedent indicates that the issuance of an injunction is appropriate."[144]

For all of these reasons, Exotic Wildlife asks this Court to grant this motion for a preliminary injunction.

Respectfully submitted,


            /s/ Nancie G. Marzulla
Nancie G. Marzulla, D.C. Bar No. 400985
Roger J. Marzulla, D.C. Bar No. 394907
MARZULLA LAW
1150 Connecticut Avenue, NW
Suite 1050
Washington, D.C.  20036
(202) 822-6760
Nancie@marzulla.com
Roger@marzulla.com

Dated: March 6, 2012            Counsel for Plaintiffs

---

[144] *Nat'l Wildlife Federation v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005).