# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE EXOTIC WILDLIFE ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE U.S. DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | )<br>)<br>)   1:12-cv-00340-RBW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## **INTRODUCTION**

Federal Defendants hereby enter their opposition to Plaintiffs' Motion for Preliminary Injunction, filed with this Court on March 6, 2012 (ECF No. 3).  Plaintiffs ask the Court to enjoin a rule issued by the U.S. Fish and Wildlife Service ("the Service") rescinding a regulation that authorized certain otherwise-prohibited activities with respect to the scimitar-horned oryx, addax, and dama gazelle (the "Three Antelope species"), a regulation that Judge Kennedy of this Court held violated the notice and comment requirements of Section 10(c) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(c).  In other words, Plaintiffs are asking the Court to issue an injunction to maintain a regulation that the Court has already ruled violates the law. Plaintiffs wish to maintain the regulation so that they can continue to raise these endangered antelopes for sale or for sport-hunting without having to obtain permits.

Plaintiffs have not even come close to carrying their heavy burden of proving they are entitled to emergency relief.  Most critically, Plaintiffs have not and cannot demonstrate that there is any likelihood that they will succeed on the merits of their claims.  These antelopes are listed as endangered species, and the ESA prohibits certain activities with respect to endangered species, including "take," absent a permit or other exemption.  While the Service believed it could issue a blanket exemption to allow otherwise-prohibited activities with respect to the Three Antelope species, Judge Kennedy found the blanket exemption violated ESA Section 10(c)'s requirement to "publish notice in the Federal Register of each application for an exemption or permit."  16 U.S.C. § 1539(c).  The Service had no choice but to rescind the regulation this Court found illegal.  Plaintiffs' arguments that the rescission was itself arbitrary and capricious or

otherwise in violation of the ESA and the National Environmental Policy Act ("NEPA") lack any support and are entirely without merit.

Plaintiffs also have not and cannot demonstrate that irreparable harm will result in the absence of an injunction or that issuing an injunction is in the public interest.  Rescission of the rule simply means that those wishing to engage in activities otherwise-prohibited by the ESA will now have to obtain a permit pursuant to regulations that have long been in place for that purpose, and that are not overly burdensome.  So rescission of the special rule just puts back into place the default scheme that otherwise would have applied absent the blanket permit, a scheme that satisfies the requirements of Section 10(c), and therefore provides the public with the required notice and opportunity to comment.

For these reasons, as explained in more detail below, the Court should deny Plaintiffs' motion.

## BACKGROUND

## I.    STATUTORY BACKGROUND

### A.    ESA Listing

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ." 16 U.S.C. § 1531(b).  Section 4 of the ESA directs the Secretary[1] to determine by regulation whether a given

---

[1] Depending on the species, either the Secretary of Commerce or the Secretary of the Interior classifies a species as endangered or threatened.  16 U.S.C. § 1533(a).  The Secretary of the Interior has responsibility for the Three Antelope species.

species should be listed as endangered or threatened. 16 U.S.C. § 1532(6); 16 U.S.C. § 1532(20); 16 U.S.C. § 1533.  This determination is made on the basis of the "best scientific and commercial data available to him after conducting a review of the status of the species . . ." 16 U.S.C. § 1533(b)(1)(A).

Once a species has been placed upon the list of endangered species, it is unlawful under Section 9 of the ESA "for any person subject to the jurisdiction of the United States" to perform certain activities, including "taking" the species, and selling or offering for sale in interstate commerce. 16 U.S.C. § 1538(a)(1).  "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any listed species.  16 U.S.C. § 1532(19).

The general prohibition against take notwithstanding, the ESA establishes specific statutory mechanisms by which a federal agency or private actor may obtain permission lawfully to take a species or its habitat.  A federal agency may obtain an "incidental take statement" through the Section 7 consultation process.  16 U.S.C. § 1536(b)(4).  Furthermore, an "incidental take permit" can be obtained by a non-federal applicant under Section 10, which authorizes take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

In addition to these provisions for incidental take, Section 10(a)(1)(A) of the ESA authorizes the Secretary to allow take "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). Applications for permits for scientific or enhancement of propagation or survival purposes are subject to the notice and review provisions of Section 10(c).  16 U.S.C. § 1539(c); 50 C.F.R. § 17.22.  Section 10(d) further provides for "exceptions under subsections 10(a)(1)(A) and (b)" if the Secretary finds and

4

publishes in the Federal Register that "(1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 1531 of this title." 16 U.S.C. § 1539(d). The Service has issued regulations setting forth general application requirements and issuance criteria governing individual permits granted for scientific purposes, enhancement of propagation or survival, or incidental take. 50 C.F.R. § 17.22.

In 1979, under ESA Section 10 authority, the Service established a permit program for enhancement of propagation or survival of captive-bred wildlife ("CBW Regulation"). 50 C.F.R. § 17.21(g). Under the CBW Regulation, a person may "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce any endangered wildlife that is bred in captivity in the United States provided . . . that . . . [t]he purpose of such activity is to enhance the propagation or survival of the affected species." 50 C.F.R. § 17.21(g)(1)(ii).

## B.     ESA Consultation

After a species is listed, under Section 7(a)(2) of the ESA, each federal agency must, in consultation with either the Service or the National Marine Fisheries Service (or both, depending on the species involved), insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the "critical habitat" of the species. 16 U.S.C. § 1536(a)(2). To assist action agencies in complying with this provision, Section 7 and the implementing regulations set out a detailed consultation process for determining the biological impacts of a proposed activity. 16 U.S.C. § 1536; 50 C.F.R. Part 402.

C.    **ESA's Application to Foreign Species**

In addition to species native to the United States, foreign species can be listed as threatened or endangered under the ESA.  16 U.S.C. § 1533(a).  Individual members of a foreign species located in the United States or on the high seas receive similar protections as domestic species.

For example, no critical habitat is designated for foreign species concurrently with listing as occurs for domestic species pursuant to 16 U.S.C. § 1533(a)(3)(A).  50 C.F.R. § 424.12(h); 49 Fed. Reg. 38,900, 38,904 (Oct. 1, 1984) (explaining to a commenter that the ESA "does not contain authority to designate critical habitat in areas outside U.S. jurisdiction.").  For similar reasons, consultation under ESA Section 7(a)(2) is not required for agency actions beyond U.S. jurisdiction or the high seas.  *See* 50 C.F.R. § 402.01(a) (Section 7(a)(2) consultation requirement applies to Federal agency actions "in the United States or upon the high seas"); 50 C.F.R. § 402.02 ("'action' means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.").

The take prohibition of Section 9 also does not apply to species in foreign countries, but only to the U.S., U.S. waters, or the high seas.  16 U.S.C. § 1538(a)(1)(B)-(C); 50 C.F.R. § 17.31.  Nevertheless, Section 9 does prohibit the import, export, possession, sale, delivery, transportation, etc. of any listed species, including foreign species.  16 U.S.C. § 1538(a)(1)(A), (D), (E), (F) & (G).  Similarly, Section 9 incorporates the provisions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora, which prohibits the import, export, trade and possession of species listed under the Convention.  16 U.S.C. § 1538(c).  Thus,

while the United States does not have the jurisdiction to prohibit take of listed species in foreign

countries, it is able to discourage take of such species through these other provisions.

### D.        The National Environmental Policy Act

NEPA is a procedural statute; it does not mandate a particular substantive result.

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978);

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).  NEPA requires agencies to

prepare an environmental impact statement ("EIS") to be included in "every recommendation or

report on proposals for legislation and other major Federal actions significantly affecting the

quality of the human environment."  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1502.3.  The two

main goals of the EIS requirement are to inject environmental considerations into the Federal

agency's decision-making process and to inform the public that the Federal agency has

considered environmental concerns.  *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768

(2004); *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir.

2001).

The regulations implementing NEPA establish procedures to assist agencies in

determining whether an EIS is required.  An agency may conduct a preliminary examination of

the proposed action, called an environmental assessment ("EA"), to determine whether a

proposed action will have significant environmental impacts such that an EIS is required.  40

C.F.R. §§ 1501.4, 1508.9.  In addition, the NEPA regulations direct agencies to identify classes

of actions, referred to as "categorical exclusions," that normally "do not individually or

cumulatively have a significant effect on the human environment."  *Id.* at §§ 1507.3(b)(2),

1508.4.  NEPA regulations exclude such actions from the requirement of preparing an EA or an

EIS.  40 C.F.R. § 1507.3(b)(2).  An agency's categorical exclusion procedures must also provide

for "extraordinary circumstances in which a normally excluded action may have a significant

environmental effect," thus requiring an EA or EIS.  *Id.* at § 1508.4.

> The Department of the Interior regulations establish categorical exclusions, including for:
>
> > Policies, directives, regulations, and guidelines: that are of an administrative,
> > financial, legal, technical, or procedural nature; or whose environmental effects
> > are too broad, speculative, or conjectural to lend themselves to meaningful
> > analysis and will later be subject to the NEPA process, either collectively or case-
> > by-case.

43 C.F.R. § 46.210(i).  The regulations also provide for exceptions due to "extraordinary

circumstances," including where the agency's action may "[h]ave significant impacts on species

listed, or proposed to be listed, on the List of Endangered or Threatened Species."  *Id.* §

46.215(h).

> An agency's decision to forego production of an EIS or EA in favor of a categorical

exclusion is subject to judicial review under the arbitrary and capricious standard of review.

*Nat'l Trust for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987); *Back Country*

*Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 98 (D.D.C. 2006).

## II.     FACTUAL BACKGROUND

### A.      The Three Antelope species

> "Historically, the scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*),

and dama gazelle (*Gazella dama*) occupied the same general region of North Africa."  70 Fed.

Reg. 52,310 (Sept. 2, 2005).  The primary reasons for the decline of all three species are habitat

loss through desertification, permanent human settlement, and competition with domestic

livestock, and regional military activity and uncontrolled killing.  *Id.*

Of the Three Antelope species, the scimitar-horned oryx is the most imperiled in the wild. *Id.*  By the mid-1980s, it was estimated that only a few hundred were left in the wild.  *Id.*  However, since the late 1980s, no sightings of this species in the wild have been reported, and at least one source indicates the species is "extinct in the wild."  *Id.*  Captive-bred scimitar-horned oryx have been placed into large fenced areas for breeding in Morocco and Tunisia and it is anticipated that these animals can re-establish wild populations.  *Id.*

The addax was extirpated from Tunisia, Libya and Algeria, but it is believed that remnant populations may still exist in the remote desert areas of Chad, Niger, and Mali, with occasional movements into Libya and Algeria during times of good rainfall.  *Id.*  In 2005 when the Service listed the species as endangered, it was believed that there were fewer than 600 addax in the wild.  *Id.*

Of the Three Antelope species, the dama gazelle is the least susceptible to pressures from humans and livestock.  *Id.*  Nevertheless, all subspecies of the dama gazelle have declined rapidly over the last 20 years, with recent estimates of fewer than 700 in the wild.  *Id.*  The dama gazelle was previously extinct in Senegal, but has since been reintroduced, and in 1997, at least 25 animals existed there as part of a semi-captive breeding program.  *Id.*

**B.      Regulatory History**

On November 5, 1991, the Service published a proposed rule to list the Three Antelope species as endangered under 50 C.F.R. § 17.11(h).  56 Fed. Reg. 56,491.  The Service re-opened the comment period to request information and comments from the public regarding the proposed rule on June 8, 1992 (57 Fed. Reg. 24,220), and then again on July 24, 2003 (68 Fed. Reg. 43,706), and November 26, 2003 (68 Fed. Reg. 66,395).

9

From the outset of the rulemaking process, the Service announced that it was considering a separate regulatory scheme to cover captive-held individuals of these three species outside the species' natural ranges.  56 Fed. Reg. at 56,491, 56,492 & 56,494; *see also* 68 Fed. Reg. at 43,707.  The Service proposed such a separate regulatory scheme on February 1, 2005.  70 Fed. Reg. 5,117.  The Service sought "data and comments from the public on this proposed rule and the draft Environmental Assessment [ ]" of the impact of the proposed rule pursuant to NEPA. *Id.*  In July 2005, the Service issued a Final EA for the proposed exemption for U.S. captive-bred antelopes.  70 Fed. Reg. 52,310.  On August 9, 2005, it issued a finding of no significant impacts, concluding that the exemption would have "no discernible adverse effects" on the antelope, native wildlife and habitat, or human health.  *Id.*

On September 2, 2005, the Service issued both a final listing determination, listing the Three Antelope species as endangered ("Listing Rule"), and a final rule adding a new regulation authorizing certain otherwise-prohibited activities with U.S. captive-bred individuals of the Three Antelope species ("Management Rule").  70 Fed. Reg. 52,319 and 70 Fed. Reg. 52,310; *see also* 50 C.F.R. § 17.21(h).

### C.    Litigation History on the Management Rule

Animal rights groups filed separate lawsuits challenging the Management Rule in the U.S. District Court for the Northern District of California, and this Court.  After dismissing in part on standing grounds, the Northern District of California court granted Federal Defendants' motion to transfer that case to this Court for consolidation with the other case already pending here challenging the same rule.  The cases were consolidated before Judge Kennedy, and the

parties filed cross-motions for summary judgment.  Safari Club International and the Exotic

Wildlife Association intervened on behalf of the Federal Defendants in both cases.

On June 22, 2009, Judge Kennedy issued an opinion granting in part and denying in part

the parties' cross-motions for summary judgment.  *Friends of Animals v. Salazar*, 626 F. Supp.

2d 102 (D.D.C. 2009).  The Court held that the plaintiffs had standing for their ESA Section

10(c) claim only, and did not have standing for their ESA Sections 4, 7, 10(a), and 10(d) claims,

or their NEPA claim.  *Id.* at 110-114.  On the merits of the ESA Section 10(c) claim, the Court

held that the Management Rule violates Section 10(c) because, under a *Chevron* step one

analysis, the Service is not allowed to issue a blanket permit for all similar activities, but must

require the filing of an application, publish notice of each application, and conduct a case-by-

case assessment of that application.  *Id.* at 115.  The Court remanded to the Service "for further

proceedings consistent with the memorandum opinion."  *Friends of Animals*, 04-cv-1660 (HHK),

ECF No. 85-2.

To comply with the Court's Order, on July 7, 2011, the Service published a proposed rule

to remove the regulation at 50 C.F.R. § 17.21(h) and eliminate the blanket permit allowing

certain activities that would otherwise have been prohibited under the ESA.  76 Fed. Reg.

39,804.  The Service provided a 30 day comment period on the proposed rule.  *Id.*  On January 5,

2012, the Service issued its final rule revising the ESA regulations by removing 50 C.F.R. §

17.21(h).  77 Fed. Reg. 431 ("Rescission Rule").  The Service explained that it was changing the

regulations "in response to a court order that found that the rule for these three species violated

section 10(c) of the Act."  *Id.*  The Service also explained that "[t]he elimination of this

regulation does not alter the current listing status of the species, but does now require that the

Service must grant individuals authorization prior to their conducting any activity that is prohibited by the Act." *Id.* at 432.  The Service considered whether there were alternative means to comply with the Court's order, but determined there were not.  *Id.*  The Service provided responses to all comments received.  *Id.* at 432-436.  The Service made the rule effective as of April 4, 2012 in order to facilitate outreach to the affected communities and "allow the affected community to either legally sell their specimens, if they choose to divest themselves of these species, or to apply for authorization or permits to continue carrying out previously approved activities." *Id.* at 431.

### D.     Litigation History on the Listing Rule and Petitions to Delist

On June 28, 2010, Safari Club International submitted a petition to the Service to delist the U.S. captive-bred herds of the Three Antelope species.  Exotic Wildlife Association ("EWA") submitted a similar petition to the Service, dated June 29, 2010.  The Service has not yet completed a 90-day finding on either petition.  *See* 16 U.S.C. § 1533(b)(3)(A).

On August 31, 2011, Safari Club International filed a complaint in this Court alleging that the Listing Rule is arbitrary because, among other reasons, the Service failed to designate the U.S. populations of the Three Antelope species separately and failed to exclude the U.S. populations from the endangered classification.  *Safari Club International v. Salazar*, 11-cv-01564 (BAH) (D.D.C.), ECF No. 1.  Safari Club International also alleged that the Service's failure to make a 90-day finding on its petition to delist the U.S. populations of the Three Antelope species violates the ESA.  *Id.*

On October 17, 2011, the Exotic Wildlife Association and other individuals filed a complaint in the U.S. District Court for the Northern District of Texas alleging that the Service's

12

failure to make a 90-day finding on their petition to delist the U.S. captive populations of the Three Antelope species violates the ESA. *Owen v. U.S. Dep't of the Interior*, 11-cv-82 (N.D. Tex.), ECF No. 1. Federal Defendants moved to dismiss the complaint for failure to provide adequate notice prior to filing suit, and alternatively to transfer the case to this Court to be consolidated with Safari Club International's case. *Id.*, ECF No. 9. The Texas court granted the motion to transfer on February 6, 2012. *Id.*, ECF No. 16. The case was ultimately assigned to Judge Howell and has been consolidated with Safari Club's case. *Owen v. U.S. Dep't of the Interior*, 12-cv-00194 (BAH) (D.D.C.). The plaintiffs' opening summary judgment briefs in that case are currently due to be filed on March 23, 2012.

Notwithstanding the fact that the Service announced over two months ago, on January 5, 2012, that the Management Rule would be rescinded effective April 4, Plaintiffs just last week filed their emergency motion, demanding injunctive relief.

## LEGAL STANDARDS

## I.    STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotations omitted). Plaintiffs have the burden of proving the need for injunctive relief; Defendants bear no burden to defeat the motion. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442-43 (1974). Moreover, because preliminary injunctive relief is an extraordinary remedy, the power to issue such an injunction "should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation omitted).

To prevail on a motion for temporary restraining order or preliminary injunction, plaintiffs must satisfy a four-part test: (1) there must be a substantial likelihood of success on the merits; (2) there must be a showing of irreparable injury if an injunction is not granted; (3) an injunction must not substantially injure other parties; and (4) the public interest must be furthered by the proposed injunction.  *See, e.g., Cityfed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  The four factors have typically been evaluated on a "sliding scale," whereby if the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)).  It is unclear whether the "sliding scale" survives in light of the Supreme Court's decision in *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S. Ct. 365 (2008).[2]  *See Sanofi-Aventis U.S. LLC v. Food & Drug Admin.*, 733 F. Supp. 2d 162, 167 (D.D.C. 2010).  However, the Court need not decide this issue, because Plaintiffs' request for a preliminary injunction here fails even under the less stringent "sliding scale" analysis of *Davenport*, as none of the four injunctive relief factors weighs in Plaintiffs' favor.  *Davis*, 571 F.3d at 1292 (declining, given the facts of the case, to decide if *Winter* created

---

[2]  In *Winter*, the Supreme Court struck down the standard applied by the Ninth Circuit that a preliminary injunction may be entered where there is only a "possibility" of irreparable harm if plaintiff has demonstrated a "strong likelihood" of prevailing on the merits.  555 U.S. at 24 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  While *Winter* did not explicitly address other variations on the "sliding scale" approach, it described the four-part test for the granting of a preliminary injunction as follows:  "A plaintiff seeking a preliminary injunction must establish that he is *likely to succeed on the merits*, that he is *likely to suffer irreparable harm* in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20. (emphasis added).

a "stricter standard" to obtain interim injunctive relief); *Northern Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116 (D.D.C. 2010) (same).

## II.     STANDARD FOR REVIEW OF AGENCY ACTION

In assessing Plaintiffs' likelihood of success on the merits, the Court must apply the standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C).  The APA provides that an agency action may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).  Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid."  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing, *inter alia*, *Overton Park*, 401 U.S. at 419).  The Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  "[T]he ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Id.*

## ARGUMENT

## I.     PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF ANY OF THEIR CLAIMS.

### A.     Plaintiffs Are Not Likely to Succeed on Their ESA Claims.

Plaintiffs make four ESA merits arguments:  (1) the Rescission Rule is arbitrary because there allegedly is no support for the existing permitting scheme; (2) the Rescission Rule is arbitrary because the Service allegedly failed to consider alternatives to the permitting scheme;

(3) the Rescission Rule is arbitrary because the Service allegedly failed to consider delisting the U.S. captive populations of the Three Antelope species; and (4) the Rescission Rule violates ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), because it allegedly is likely to jeopardize the continued existence of the species.  Plaintiffs are unlikely to succeed on the merits of any of these claims because Plaintiffs have failed to provide any legal support for their arguments and the claims are otherwise meritless.

      1.      <u>The Rescission Rule is Entirely Rational and Supported by the Record</u>.

As explained above, in July 2011, the Service proposed to remove the Management Rule in order to comply with Judge Kennedy's determination that the Management Rule violates ESA Section 10(c) because it fails to provide the public with notice and an opportunity to comment on each application for a permit to engage in certain otherwise-prohibited activities with respect to U.S. captive members of the Three Antelope species.  The Service did not propose a different permitting system or to delist the U.S. captive population of these species and was under no obligation to do so.  After providing an opportunity for comment on the proposal, the Service issued a final rule removing the Management Rule, with a delayed effective date.  The Service explained that the basis for its decision was to comply with the Court's order and that removing the Management Rule was the only means for the Service to comply with that order.  77 Fed. Reg. at 431-32.  The Service's decision was entirely rational.  The Service had to act to comply with the Court's order and, conversely, not acting would have allowed a regulation that violates the ESA to remain in place.

Plaintiffs do not argue that there was something the Service could have done to amend the Management Rule to bring it into compliance with ESA Section 10(c).  Instead, they argue

16

that the January 2012 Rescission Rule is arbitrary because there was no evidence that "imposing" the existing permitting scheme (i.e., the regime absent the Management Rule) would not result in holders of these species eliminating or reducing their herds of U.S. captive-bred members of the Three Antelope species.  Pls' Br. at 19-20.  Contrary to Plaintiffs' argument, the Service did not have to consider the impact of reverting back to the existing permitting scheme that applies to endangered species.  By removing the Management Rule, the Service was not "applying" the existing permitting system to holders of these animals; that system simply goes back into place in the absence of the Management Rule.  In addition, whether removing the Management Rule would lead to negative impacts to the species or not was irrelevant, since the Service did not have discretion to leave the Management Rule in place in light of Judge Kennedy's ruling.

In any case, the Service appropriately responded to the comments it received on the alleged elimination or reduction in captive herds in the U.S. absent the Management Rule.  The Service explained that "[r]anches that currently have other endangered hoofstock already obtain permits for the same activities with those other species" and that ranches should be able to continue the same activities they legally conducted under the Management Rule under the existing permit system.  77 Fed. Reg. 433 (Resp. to Cmt. 4).  In addition, the Service acknowledged that while there could be some reduction in the number of herds, it did not believe this would "significantly influence the genetics of the remaining herds, if they are being properly maintained" and that "[t]here should be no reduction in herds that were actually being used for conservation purposes."  *Id.*  Given the Service's experience and expertise as the permitting authority for decades, these determinations were reasonable.  *Baltimore Gas & Elec. Co. v.*

*Natural Res. Def. Council*, 462 U.S. 87, 103 (1983) (particular deference is due to agencies

making scientific determinations within their area of special expertise).

2. The Service Adequately Responded to Comments and, to the Extent Required, Adequately Considered Alternatives.

Plaintiffs next argue that the Rescission Rule is arbitrary because the Service "completely

failed to consider any alternative to the permitting scheme envisioned in the final rule." Pls' Br.

at 21. Tellingly, Plaintiffs' brief is devoid of any authority to support the proposition that the

Service was required to consider alternatives to the permitting scheme. Nothing in the ESA or

APA requires the Service to consider such alternatives. While the Service does have discretion

to propose different permitting schemes, it is not required to do so. *WWHT, Inc. v. FCC*, 656

F.2d 807, 818 (D.C. Cir. 1981) ("It is only in the rarest and most compelling of circumstances

that this court has acted to overturn an agency judgment not to institute rulemaking."). This

decision was particularly reasonable given that it already has a permitting system that covers the

sorts of activities permitted by the rescinded rule. If Plaintiffs wanted the agency to consider a

different permitting system, they had plenty of time to petition the agency to consider such a

proposal – yet, Plaintiffs never did so. *See* Declaration of Timothy J. Van Norman ("Van

Norman Decl.") (attached hereto as Exhibit 1) ¶ 11.

While the Service did not have to propose a different permitting system, it did have to

respond to comments suggesting such a system if such comments qualify as "significant." Here,

the Service did receive comments that suggested alternatives to the permitting scheme, but these

comments were not "significant," and so the Service did not have to respond to them. Even if

these comments were "significant," the Service provided adequate responses to them.

18

The APA requires agencies to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . ." and "[a]fter consideration of the relevant matter present, . . . shall incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  The D.C. Circuit has explained that this provision "has never been interpreted to require [an] agency to respond to every comment, or to analyse [sic] every issue or alternative raised by comments, no matter how insubstantial." *American Mining Congress v. EPA*, 907 F.2d 1179, 1187-1188 (D.C. Cir. 1990) (citation omitted).  Agencies also do not have to respond to "comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest."  *Home Box Office v. FCC*, 567 F.2d 9, 36 n.58 (D.C. Cir. 1977).  Rather, agencies are required to respond only to "significant" comments, which are those "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule [or] cast doubt on the reasonableness of a position taken by the agency."  *Id.* at 36.

Plaintiffs allege that the Service failed to respond to the numerous comments provided on the proposed rule that criticize the existing permitting system and/or suggest an alternative permitting scheme for the U.S. captive population of the Three Antelope species.  However, since the comments did not offer a solution to fix the ESA Section 10(c) problem with the Management Rule, they cannot be considered "significant" as they raise points not relevant to the decision and would not, if adopted, require a change to the proposed rule.  The Service acknowledged this when it responded to such comments with the statement that "[t]hese comments are outside the scope of this rulemaking because they do not address the Court's

ruling that 50 CFR 17.21(h) violates section 10(c) of the Act and the rescission of 17.21(h)."  77

Fed. Reg. at 436 (Resp. to Cmt. 15).

While the Service was not required to respond to these comments, this does not mean that

the Service did not consider alternatives.  Indeed the Service stated in the preamble to the

Rescission Rule that it

> considered whether there were alternative means to comply with the Court's
> ruling without requiring ranches or other facilities holding these species to obtain
> a permit or other authorization.  However, the Service was unable to identify an
> alternative other than the currently established regulations at 50 CFR 17.21(g) and
> 17.22 – providing for the registration of captive-bred wildlife or issuance of a
> permit – that would provide the public an opportunity to comment on proposed
> activities being carried out with these species.  In addition, the Service did not
> receive any comments or suggestions from the public that presented a viable
> alternative…

77 Fed. Reg. at 432; *see also id.* (Resp. to Cmt. 1), *id.* at 436 (Resp. to Cmt. 15).  In addition,

although the Service determined that the suggested alternative permitting schemes or changes to

the existing system were outside the scope of the rulemaking, it stated that it

> will consider [the comments] as we develop ways to improve efficiency and
> effectiveness of our permitting process.  We are currently working on certain
> improvements, such as the development of electronic applications and more
> timely review processes.  We are considering other efficiency improvements as
> well.  We encourage anyone who has recommendations on how to improve our
> current permitting process to contact the Service's Division of Management
> Authority, Branch of Permits

77 Fed. Reg. at 436 (Resp. to Cmt. 15).  Under the circumstances, the Service's response was

more than adequate.

        3.      <u>The Service Did Not Have to Consider Delisting the U.S. Population of
the Three Antelope Species in the Context of the Removal of the
Management Rule</u>.

Plaintiffs' third ESA argument is that the rule is arbitrary because the Service refused to consider delisting the U.S. captive population of the Three Antelope species, presumably in lieu of, or in conjunction with removing the Management Rule.  Pls' Br. at 30-31.  Plaintiffs' claim lacks merit because the Service has discretion whether to propose to delist a species on its own initiative, and the Service was not required to affirmatively consider delisting as part of the rulemaking to remove the Management Rule.  Plaintiffs have filed a petition to have the U.S. captive populations of these species delisted, and have alleged in a separate lawsuit that the Service has failed to make a timely finding on that petition.  If the outcome of the petition process is not to Plaintiffs' satisfaction, they will have the opportunity to challenge the Service's decision at that time.

There are two ways a listed species can be considered for delisting.  First, the Service can, on its own initiative, propose a rule to delist all or part of a species.  ESA Section 4 authorizes the Secretary on his own initiative to list and delist species, provided the criteria for listing or delisting are met.  16 U.S.C. § 1533(a)(1) and (c)(1); 50 C.F.R. § 424.11(d).  The Service has substantial discretion to decide whether to propose a species for listing or delisting on its own initiative.  *See Wyoming v. U.S. Dep't of the Interior*, 360 F. Supp. 2d 1214, 1231-32 (D. Wyo. 2005) (court lacked jurisdiction because the Service had no mandate to delist).

The second way a species can be considered for delisting is by the filing of a petition. Section 4(b)(3)(A) of the ESA provides that an "interested person" may petition the Secretary to add a species to the list of threatened or endangered species or to remove a species from either list.  16 U.S.C. § 1533(b)(3)(A).  The filing of a petition triggers a series of deadlines for responding to the petition, depending on the outcome at each stage of the process.  *See* 16 U.S.C.

§ 1533(b)(3)(A) (requiring a substantial information finding within 90 days to the maximum extent practicable), § 1533(b)(3)(B) (requiring a finding whether the petitioned action is warranted within 12 months, if a positive 90 day finding is made), § 1533(b)(3)(B)(ii) (requiring prompt publication of a proposed rule in the Federal Register if the petitioned action is determined to be warranted).  If the Service makes a negative 90-day finding, finds that the petitioned action is not warranted, finds that the petitioned action is warranted but precluded, or withdraws a proposed rule to list or delist a species, such decision is subject to judicial review. 16 U.S.C. §§ 1533(b)(3)(C)(ii), 1533(b)(6)(B)(ii).

Here, the Service has chosen not to use its inherent authority to delist the U.S. population of the Three Antelope species.  Plaintiffs do not allege that the Service violated the ESA by failing to exercise this authority, nor could they.  5 U.S.C. § 701(a)(2) (judicial review inapplicable " to the extent that agency action is committed to agency discretion by law"); *Wyoming*, 360 F. Supp. 2d at 1232.  Rather, Plaintiffs argue that the Rescission Rule is arbitrary because the Service failed to consider delisting the U.S. populations of the Three Antelope species in conjunction with its decision to remove the Management Rule.  This is another variant on Plaintiffs' argument that the Service failed to consider alternatives to the permitting scheme. As explained above, the Service was under no obligation to consider alternatives.  Even if it were, delisting is not an alternative to removing the Management Rule that the Court found was in violation of the ESA.  77 Fed. Reg. at 434 (Resp. to Cmt. 8) ("Discussion of the listing status of these species, including changing that status, is outside the scope of this rulemaking.").  While delisting the U.S. populations of the Three Antelope species may have made the Management Rule unnecessary, the Service would still have needed to remove the Management Rule from the

Code of Federal Regulations.  As the Service explained, the only proceeding consistent with the Court's opinion was to remove the Management Rule, thereby by default requiring individual applications for permits to engage in otherwise-prohibited activities pursuant to the existing permit system.  77 Fed. Reg. at 432 ("the Court's finding left us no options but to rescind the current regulation at 50 C.F.R. § 17.21(h)").

While Plaintiffs cannot force the Service to use its inherent authority to propose to delist the U.S. captive population of the Three Antelope species, they are not without recourse because they can petition the Service to take the same delisting action and, in fact, they have already done so.  As noted above, Plaintiffs submitted a petition to the Service on June 29, 2010 to delist the U.S. captive population of the Three Antelope species.  The Service has been unable to complete a 90-day finding on the petition (and a similar petition filed by Safari Club International) to date. Plaintiffs have brought suit alleging that the Service has violated the ESA by failing to timely respond to their petition.  *Owen v. U.S. Dep't of the Interior*, 12-cv-00194 (BAH) (D.D.C.). Briefing will begin in that case later this month.  If Plaintiffs are not happy with the outcome of the petition process, they can seek judicial review of the Service's decision.  Thus, the Service will be considering delisting the U.S. captive population of the Three Antelope species, just as Plaintiffs desire.  However, the Service was not required initiate that process based on its inherent authority or in conjunction with or in lieu of its rulemaking to remove the Management Rule.  Accordingly, Plaintiffs are not likely to succeed on the merits of their claim that the challenged rule is arbitrary because the Service failed to consider delisting the U.S. captive populations of the Three Antelope species.

4.   Plaintiffs Failed to Provide the Required Notice for their Section 7 Claim, the Service Did Not Have to Consult Under ESA Section 7, and In Any Case, the Rescission Rule Will Not Jeopardize the Continued Existence of the Species.

Plaintiffs also contend that the Service violated ESA Section 7(a)(2) because the removal of 50 C.F.R. § 17.21(h) allegedly is likely to jeopardize the continued existence of the species. Pls' Br. at 31-34.  While Plaintiffs are not entirely clear, it appears they are arguing that the Service, as an action agency, has not met its substantive obligations under ESA Section 7(a)(2) to ensure that its action is not likely to jeopardize the species.  There are several problems with Plaintiffs' argument.

First, if Plaintiffs are challenging the Service in its role as an action agency, then they were required to provide the Service with 60 days notice of their intent to sue, but they did not. 16 U.S.C. § 1540(g)(1)(A).  Section 7(a)(2) claims against an action agency are considered ESA citizen-suit claims, which are subject to the ESA's notice requirement.  *Bennett v. Spear*, 520 U.S. 154, 173-175 (1997).[3]  The notice requirement is jurisdictional, and so Plaintiffs failure to provide notice mandates dismissal of their claim.  *Research Air, Inc. v. Norton*, No. Civ. A. 05-623, 2006 WL 508341, at *10 (D.D.C. Mar. 1, 2006); *Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 104 (D.D.C. 2004).

---

[3] *Bennett* made a distinction between Section 7 claims "against regulated parties – both private entities and Government agencies" (also known as action agencies) and "judicial review of the Secretary's [as the consulting agency] implementation of the statute." *Bennett*, 520 U.S. at 173. Although *Bennett* held that the Service could not be sued as the consulting agency under 16 U.S.C. § 1540(g)(1)(A), the Court expressly adopted the government's view that action agencies could be sued under that provision. *Id.*; *see also EPIC v. Simpson Timber*, 255 F.3d 1073, 1079 (9th Cir. 2001).

Second, not all Federal agency actions are subject to the consultation requirements of Section 7 of the ESA.  An agency is required to consult only on actions where it has discretion to implement measures that inure to the benefit of protected species.  ESA Section 7(a)(2) defines an "agency action" as "any action authorized, funded, or carried out" by a federal agency.  16 U.S.C. § 1536(a)(2).  In turn, the ESA regulations provide that "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03 (emphasis added).  The Supreme Court has upheld that regulation, granting *Chevron* deference to its interpretation of the ESA.  *National Ass'n of Home Builders v. Defenders of Wildlife* ("*NAHB*"), 551 U.S. 644, 666-667 (2007).

Based on this statutory and regulatory language, the Supreme Court has made clear that the consultation requirement of Section 7(a)(2) of the ESA "covers only discretionary agency actions and does not attach to actions . . . that an agency is required by statute to undertake once certain specified triggering events have occurred." *NAHB*, 551 U.S. at 669 (emphasis in original).  The D.C. Circuit has held likewise.  *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 33-34 (D.C. Cir. 1992) (holding that Section 7 of the ESA did not apply where the agency did not have the discretion to modify the license at issue) (cited with approval in *NAHB*, 551 U.S. at 664).

As discussed above, Federal Defendants did not have any choice but to remove the Management Rule from the regulations after Judge Kennedy's ruling that the rule violates ESA Section 10(c).  *See, e.g.*, *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000) (a party that violates a court order is subject to contempt proceedings).  The Service did not have the option

to leave the rule in place even if it benefits the Three Antelope species.  There was no way to fix the rule to make it consistent with ESA Section 10(c) and so it had to be removed.

Plaintiffs argue that the Service did have discretion to implement a different permitting system.  But this is not the same thing as having discretion whether to remove a regulation that a Court has found violative of the statute and which cannot be fixed.  Moreover, as explained above, while the Service may have discretion to adopt a different permit system, it was not required to do so at the same time it removed the Management Rule, or at all, especially given that the Service already has a permit system in place that satisfies ESA Section 10(c).

In sum, Federal Defendants lack the discretion that would trigger a consultation requirement under Section 7 of the ESA, and thus Plaintiffs' ESA claim must fail.  *Natural Res. Def. Council, Inc. v. Houston*, 146 F.3d 1118, 1125-26 (9th Cir. 1998) ("Where there is no agency discretion to act, the ESA does not apply."); *NAHB*, 551 U.S. at 665, 669.

Third, the Rescission Rule is not likely to jeopardize the continued existence of the species, as Plaintiffs contend.  To begin with, it would be odd to find that a rule that removes a regulation found to be violative of the ESA, constitutes a violation of a different section of the ESA, particularly where the Rescission Rule adhered to the instructions of a Court order.  Moreover, as discussed in detail below, removing the Management Rule does not harm the Three Antelope species.  Consequently, Plaintiffs' argument that the Rescission Rule is going to jeopardize the species fails.

**B.**      **Plaintiffs Are Not Likely to Succeed on Their NEPA Claim.**

Like its ESA claims, Plaintiffs also are unlikely to succeed on the merits of their NEPA claim.  Plaintiffs' NEPA claim fails for two reasons.  First, the Service did not have to comply

26

with NEPA because it lacked discretion whether to remove the Management Rule.  Second, even if the Service had discretion whether to remove the Management Rule, the Service appropriately determined that the Rescission Rule is categorically excluded from NEPA requirements.

Where an agency lacks discretion concerning the action to be taken, NEPA does not apply as a matter of law.  *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151-53 (D.C. Cir. 2001) ("If . . . the agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable.").  *See also Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1260-63 (10th Cir. 2001) (Because legislation required the Secretary to acquire land in trust for the Tribe when directed by the Tribe, NEPA analysis would have been pointless, and the statute does not apply.); *South Dakota v. Andrus*, 614 F.2d 1190, 1193 (8th Cir. 1980) ("Reasoning that the primary purpose of the impact statement is to aid decisionmaking, courts have indicated that nondiscretionary acts should be exempt from the requirement.").  Often an agency's lack of discretion is a function of constraints in legislation.  However, as in this case, a court order can have the same effect.  Here, Judge Kennedy held that the Management Rule violates ESA Section 10(c) and remanded to the Service.  On remand, the Service determined that it had no other way to comply with Judge Kennedy's ruling but to remove the Management Rule.  Accordingly, because the Service lacked sufficient discretion to take a different action, NEPA does not apply here as a matter of law.

Even if the Court were to determine that NEPA does apply, the Service complied with NEPA by determining that its action qualified for a categorical exclusion.  As the Service stated:

The Service has determined that this rule is a regulatory change that is administrative and legal in nature.  The rescission of this rule responds to a Court ruling finding that 50 CFR 17.21(h) violates section 10(c) of the Act and remanding to the agency for further proceedings consistent with its opinion.  As such, the rule is categorically excluded from further NEPA review as provided by 43 CFR 46.210(i) of the Department of the Interior's Implementation of the National Environmental Policy Act of 1969 regulations (73 FR 61292; October 15, 2008).

77 Fed. Reg. at 437.

Plaintiffs argue that the Service improperly invoked the categorical exclusion at 43 C.F.R. § 46.210(i) for two reasons.  First, they claim the Service failed to adequately explain the basis for the invocation of the exclusion.  Pls' Br. at 35.  Second, Plaintiffs contend that "extraordinary circumstances" exist, citing the exceptions for such circumstances where the action may "[h]ave significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species," 43 C.F.R. § 46.215(h).  Pls' Br. at 35-36.  Neither argument has merit.

Plaintiffs first complain that the Service's explanation for why the Rescission Rule falls within the categorical exclusion is "conclusory" and "sparse."  Pls' Br. at 35.  Their contention ignores this Court's recognition that a "brief statement" does not render invocation of categorical exclusion arbitrary, though it might if substantial record evidence suggests that exceptions to the categorical exclusion are applicable.  *See Reed v. Salazar*, 744 F. Supp. 2d. 98, 116 (D.D.C. 2010) (citing *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) and *Wilderness Watch & Pub. Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004 ("In most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered.").  Here, Plaintiffs

identify no such evidence.  They simply press their unsupported theory that the species will be harmed by rescission of the invalidated Management Rule.  The Service disagrees.  It recognized that some reduction in number of captive animals might occur, but concluded this would not significantly influence the genetics of the remaining herds.  This determination, falling within the Service's area of expertise, is entitled to substantial deference.  *Baltimore Gas & Elec. Co.*, 462 U.S. at 103.

Plaintiffs cite to the requirement that agencies comply with NEPA "to the fullest extent possible" and to a D.C. Circuit case that they allege stands for the proposition that NEPA "exemptions are narrowly construed" to attempt to support their argument.  Pls' Br. at 35 (citing 42 U.S.C. § 4332 and *Calvert Cliffs Coordinating Committee v. U.S. Atomic Energy Commission*, 449 F.2d 1109, 1115 (D.C. Cir. 1971).  As explained above, however, the NEPA regulations allow an agency to satisfy its NEPA obligations by invoking an applicable categorical exclusion.  So an agency fully complies with NEPA when it invokes a categorical exclusion, just as it does when it prepares an EA or EIS, so long as it has support for its choice of method of compliance.  Furthermore, the passage in *Calvert Cliffs* Plaintiffs cite to involved the situation where an agency concluded it did not have to comply with NEPA because its obligations under a different statute conflicted with NEPA.  449 F.2d at 1115 n.12.  Here, the Service fully complied with NEPA by invoking a categorical exclusion; it did not claim that it could not comply with NEPA.

The Service explained its determination that the Rescission Rule is "administrative and legal in nature," 77 Fed. Reg. at 437, given that there were no alternative means for the Service to comply with Judge Kennedy's ruling that the Management Rule violates ESA Section 10(c).

77 Fed. Reg. at 432.  This explanation more than adequately satisfies the Service's minimal

burden to invoke the categorical exclusion for "policies, directives, regulations, and guidelines:

that are of an administrative, financial, legal, technical, or procedural nature," 43 C.F.R. §

46.210(i).

Plaintiffs next argue that the Service improperly invoked the categorical exclusion

because the Rescission Rule will have significant impacts on the Three Antelope species, and

thus an "exception to the exception" applied.  Pls' Br. at 36.  Plaintiffs do not specify precisely

why they believe the Rescission Rule will have significant impacts on the Three Antelope

species, but presumably their reasons would be the same as in their arguments of harm to the

species elsewhere in their briefing, *i.e.*, that removing the Management Rule will harm the

species because holders of U.S. captive members of the species will reduce or eliminate their

herds, rather than attempt to get permits through the existing permit processes.  But rather than

identifying evidence of this harm, Plaintiffs improperly ask the Court to adjudge the Service's

invocation of the categorical exclusion by a standard applicable to assessing whether a finding of

no significant impact is arbitrary,  Pls' Br. at 36-37, citing *Sierra Club v. Peterson*.  The Court

should not do so.

As noted above, invocation of a categorical exclusion may be deemed arbitrary and

capricious if there is substantial evidence in the record that an "extraordinary circumstance"

might apply and the agency fails to explain its determination.  *See, e.g., Brady Campaign to

Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 17 (D.D.C. 2009) (holding that agency's

failure to consider reasonably foreseeable impacts of agency action is sufficient to render the

agency's invocation of a categorical exclusion arbitrary and capricious); *California v. Norton*,

30

311 F.3d 1176.  Here, there was no evidence, let alone substantial evidence in the record that the Rescission Rule would have significant impacts on the Three Antelope species.  As has been explained already, the Service considered the possibility that holders of U.S. captive members of the Three Antelope species might dispose of their stock rather than obtain authorization or permits before carrying out previously exempted activities and determined that it did not believe this would occur, and, if it did, that it would not significantly impact the conservation of the species.  77 Fed. Reg. at 433 (Resp. to Cmt. 4).  Thus, the Service adequately explained its determination.  Plaintiffs have not shown arbitrary conduct by the agency because they have not identified any relevant factor that the Service overlooked nor have they demonstrated a clear error in judgment.  *Overton Park*, 401 U.S. at 416; *Milk Indus. Found.*, 132 F.3d at 1476.

## II.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF AN INJUNCTION.

Plaintiffs are not entitled to a preliminary injunction here because they have not shown that they are likely to suffer "irreparable harm" without it.  They have apparently decided to sell, abandon, or even kill these endangered antelope instead of simply applying for the permits that will be required by the law starting in April.  But if they are harmed by that decision, the harm is self-inflicted and cannot justify an injunction against the Service.  Moreover, the required permits impose only modest burdens on Plaintiffs that do not rise to the level of irreparable harm.  And even if Plaintiffs were correct, and the permitting process was both "costly" and "burdensome," that still would not justify a preliminary injunction because this Court has held that these permits are required by the ESA.

Plaintiffs broadly allege two kinds of harm in their motion: economic harm and harm to the species themselves.  *See, generally*, Pls' Br. at 38-43.  For economic harm, Plaintiffs claim that they have lost earnings and that the value of their animals has "dropped dramatically."  *See, e.g.,* Caffey Decl., ECF No. 3-7 (Mar. 6, 2012) ¶ 4 ("I will lose between $100,000 and $120,000 of gross earnings annually . . . ."); Blassingame Decl., ECF No. 3-6 (Mar. 6, 2012) ¶ 5 ("Prices for on-the-hoof sales have dropped dramatically."); Valicek Decl., ECF No. 3-14 (Mar. 6, 2012) ¶ 4 ("I sold off half of my herd, and at a substantial loss.").  But even if these allegations are true, they do not justify a preliminary injunction because it is black-letter law that "economic loss does not, in and of itself, constitute irreparable harm."  *See, e.g., Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Recognizing that economic harm alone cannot justify a preliminary injunction, Plaintiffs try to show that the Rescission Rule will also cause "enormous and irreparable injury" to the species themselves.  Pls' Br. at 38-39.  Or more properly, Plaintiffs allege that the Rescission Rule will injure their interest in these species (since Article III remedies must redress an "injury to the plaintiff," not an "injury to the environment.").  *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).

Of course, the Service's Rescission Rule does not harm these species directly (and Plaintiffs do not claim that it does).[4]  To the contrary, it extends the full protections of the ESA to these endangered antelope by eliminating the exclusion that this Court found to be unlawful.

---

[4] Plaintiffs cite *TVA v. Hill*, but that case has no application here because it was undisputed in *TVA v. Hill* that the challenged action would "eradicate the known population" of the species and "destroy [its] critical habitat."  437 U.S. 153, 171 (1978).  Here, in contrast, it is undisputed that the Rescission Rule will not directly harm these species.

But Plaintiffs argue that the Rescission Rule will indirectly harm the species—in fact, they claim that it will push these species to extinction—allegedly by making it "financially impossible to raise, breed, manage, and conserve" them.  Pls' Br. at 38-39.

To be clear, the Rescission Rule does not make it illegal for Plaintiffs to continue to raise, breed, or even hunt these animals.  As the Service has confirmed, Plaintiffs "should be able to continue those activities."  77 Fed. Reg. at 433.  But they will now need permits to do so.

Plaintiffs do not argue that the permitting process is unlawful, and they have not challenged the regulations that govern that process.  Instead, they contend that obtaining these permits is so "complex," "costly," and "time-consuming" that their entire business will be rendered "unprofitable" and "financially impossible."  Pls' Br. at 2, 38-39; *see also, e.g.,* Dockery Decl., ECF No. 3-9 (Mar. 6, 2012) ¶ 3; Seale Decl., ECF No. 3-5 (Mar. 6, 2012) ¶ 13.

This is untrue.  First, the ESA does not regulate the possession of these animals or "purely intrastate activities (with the exception of take)," so Plaintiffs may continue to possess these animals, transport them within a State, or sell them to another party in the same State even without a permit.  77 Fed. Reg. at 433; Van Norman Decl. ¶ 8.  Second, the forms that Plaintiffs must fill out to obtain the permits for other activities are relatively simple.  For example, to sell and transport these animals between States, Plaintiffs may either obtain an interstate commerce permit for the sale (Form 3-200-37), or they may engage in multiple interstate sales if both parties register for a "captive-bred wildlife" ("CBW") permit (Form 3-200-41).  Van Norman Decl. ¶ 3.  If Plaintiffs get a captive-bred wildlife permit, they may also cull their animals as necessary to maintain a viable and healthy herd.  *Id.*  Plaintiffs that obtain a captive-bred wildlife permit, however, are required to submit annual reports to the Service (Form 3-200-41a).  *Id.* ¶ 4.

33

The interstate commerce permit is valid for a single sale; the captive-bred wildlife permits are valid for five years. *Id.* ¶ 3. More than 400 facilities nation-wide currently hold captive-bred wildlife permits (including both zoos and individual hobbyists). *Id.* ¶ 9.

In addition, if Plaintiffs want to allow hunters to come onto their ranches to hunt these animals, they will also have to obtain a "take" permit (Form 3-200-37). *Id.* ¶ 5. The take permit is valid for one year, but may be renewed annually. *Id.*

So to continue all of the activities that were allowed under the old, unlawful exclusion, Plaintiffs must obtain two permits. The Service's official estimates of the time required to fill out the forms for these permits are: (1) two hours for the initial captive-bred wildlife permit registration (which must be filled out again every five years), and then an additional 30 minutes each year for the annual report; and (2) two hours to apply for the required take permit and then an additional 15 minutes each year for the renewal of the permit. 75 Fed. Reg. 53,330 (Aug. 31, 2010); Van Norman Decl. ¶ 6.[5] Thus, the Service estimates that Plaintiffs would have to spend **about seven hours every five years** filling out the forms to obtain the necessary permits. Van Norman Decl. ¶ 6.

This burden is very modest, and the Service has tried to reduce it even further by providing additional guidance to Plaintiffs and by eliminating questions on these forms that do not apply to them. *Id.* In fact, Plaintiffs were already required to compile much of this information under the old, unlawful exclusion. 77 Fed. Reg. at 433; 50 C.F.R. § 17.21(h)(7) (requiring Plaintiffs to "maintain accurate written records of activities, including births, deaths,

---

[5] These time estimates were prepared to comply with the Paperwork Reduction Act and not for this litigation. *See* 75 Fed. Reg. 53,300.

and transfers of specimens . . . .").  The Service also provided an "extended effective date" for the Rescission Rule so that it could work with these Plaintiffs and so they would have more time to "either . . . apply for authorization or permits to continue carrying out previously approved activities" or to "legally sell their specimens, if they choose to divest themselves of these species . . . ."  77 Fed. Reg. at 431.

The Service is also working to improve the permitting process more generally by developing "electronic applications and more timely review processes."  77 Fed. Reg. at 436. The permits do not impose "any significant financial burden," and cost at most $700 over five years.  *Id.* at 433, 437.  The Service should be able to approve permits for all of the Plaintiffs because the criteria are "similar or identical to the criteria" established under the old exclusion. *Id.* at 435.  The Service estimates that it will generally take about 45 days to process applications for these permits (if Plaintiffs apply)[6], Van Norman Decl. ¶ 7—and it would be hard (if not impossible) for the Service to reduce that time because Plaintiffs' applications must be subject to public notice and comment for 30 days.

So the evidence does not support Plaintiffs' claims that the permitting process will be "time consuming," "lengthy," and "burdensome."  *See, e.g.,* Green Decl., ECF No. 3-11 (Mar. 6, 2012) ¶ 2 (alleging without evidence that "we have to get a time consuming government permit and annual government approval . . . ."); Caffey Decl., ECF No. 3-7 (Mar. 6, 2012) ¶ 4 (alleging without evidence that "the permits cost time and money, and create great uncertainty."); Seale

---

[6] One Plaintiff already has a CBW permit and one other Plaintiff has applied for a CBW permit. Van Norman Decl. ¶ 7.  That application was received on January 26, was put out for the public comment required by the law, and the Service issued the registration and permit on March 12, 2012.  *Id.* ¶ 7.

Decl., ECF No. 3-5 (Mar. 6, 2012) ¶ 13 (alleging without evidence that the permitting process will be "lengthy and burdensome."). And almost all of Plaintiffs' claims about this permitting process are simply bald allegations, unsupported by any evidence whatsoever. Even in the single declaration where Plaintiffs claim that their allegations are supported by "experience working with the [Service]," that experience is with other species, not these endangered antelope, and it ignores recent guidance from the Service. Johnson Decl., ECF No. 3-12 (Mar. 6, 2012) ¶ 2 (expressly ignoring "recent statements in writing by the [Service]."). Plaintiffs have not cited any cases where this kind of modest regulatory burden was found to cause irreparable harm (or any case where any regulatory burden, however costly and onerous, was found to cause irreparable harm).

Moreover, if Plaintiffs are harmed here, the harm is self-inflicted. Plaintiffs have a choice, and they have apparently decided to sell, abandon, or kill these endangered antelope instead of applying for the required permits. The courts will not grant an injunction to protect Plaintiffs from their own decision because no litigant "can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). The D.C. Circuit has "consistently held" that such "self-inflicted harm doesn't satisfy the basic requirements for standing": it "does not amount to an 'injury' cognizable under Article III" and, even it did, "it would not be fairly traceable to the defendant's challenged conduct." *National Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (citations omitted). Similarly, the law is "well-settled that '[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Lee v. Christian Coal. of America, Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) (citations omitted).

In fact, at least one court has reviewed this exact issue and found that a plaintiff's refusal to obtain a permit required by law (or, in that case, a license) cannot constitute irreparable harm. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003).  That court concluded that, "[i]f the license can be had, then the lack of an injunction does not lead to irreparable harm." *Id.*  Rather, "[a]ny injury that [plaintiff] incurs by [not obtaining a license] is of its own choosing" and "self-inflicted," and "self-inflicted wounds are not irreparable injury." *Id.  See also Kaplan v. Board of Educ.*, 759 F.2d 256, 259 (2d Cir. 1985) (holding that plaintiff board members' threat to "resign or face dismissal rather than comply with the [challenged] regulation" did not constitute irreparable harm necessary to enjoin the regulation).

And even if Plaintiffs were being harmed here, and that harm was not self-inflicted, it would still not justify an injunction because this alleged harm is being caused by the requirements of the ESA itself, not the Service's Rescission Rule.  Citing Section 10 of the ESA, 16 U.S.C. § 1539, this Court held that the Service's previous exclusion of Plaintiffs from these permitting requirements was unlawful.  *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 115-120 (D.D.C. 2009).  The Court found that the text of the ESA, its "context, purpose, and legislative history," all show that "Congress intended permits for the enhancement of propagation or survival of an endangered species to be issued **on a case-by-case basis following an application and public consideration of that application**." *Id.* at 115 (emphasis added). The Court held that the ESA requires Plaintiffs to submit "a full statement of the reasons why [they are] justified in obtaining a permit" so that the Service can determine whether the Plaintiffs' activities will, in fact, "enhance the propagation or survival of the species." *Id.* at 118. The Court also held that excluding Plaintiffs from these permitting requirements "shut out" the

public and "deprive[d] [environmental groups] of the information they would otherwise be provided to assess whether individual facilities will or are in fact maintaining the antelope species in a manner that contributes to their propagation or survival." *Id.* Finally, the Court also concluded that the ESA expressly requires the Service to publish notice of Plaintiffs' applications for these permits in the Federal Register so that they may be the subject of public comment for 30 days. *Id.* at 106 (citing 16 U.S.C. § 1539(c)).

The Rescission Rule that Plaintiffs are challenging here eliminates the exclusion that this Court has already found was unlawful. 77 Fed. Reg. at 431 (stating that the Service removed this exclusion "in response to a court order that found that the rule for these three species violated section 10(c) of the Act."). Plaintiffs have admitted that the Court's decision "basically required removing the exception for these three species . . . ." Johnson Decl., ECF No. 3-12 (Mar. 6, 2012) ¶ 5. The Service cannot allow Plaintiffs to continue to operate under the old, unlawful exclusion consistent with this Court's order (which is exactly the relief that Plaintiffs seek in their motion for preliminary injunction). Nor can it "unquestionably accept that the activities of a ranch with these species have a presumptive enhancement value and therefore issue a permit or other authorization 'pro forma.'" 77 Fed. Reg. at 432.

To comply with the ESA and this Court's order, the Service had "no other option than to remove" the old, unlawful exclusion. *Id.* at 435. The Service's compliance with the ESA cannot now be heard to cause irreparable harm to Plaintiffs. This Court has decided what the ESA requires, and it should not enjoin the Service from implementing its decision.

Plaintiffs believe that their efforts contribute more to the survival and recovery of these species than the stricter permitting requirements that will now be imposed by the ESA. The

Service does not dispute the value of Plaintiffs' conservation efforts.  *See, e.g., id.* at 435.  But if Plaintiffs believe that they have been harmed by the loss of this exclusion, they must direct their complaints to Congress, not this Court or the Service, because "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforcement them . . . ."  *TVA v. Hill*, 437 U.S. 153, 194 (1978).  Plaintiffs' motion should be denied because they have failed to show that they are likely to be irreparably harmed by the Service's Rescission Rule.

## III.     THE PUBLIC INTEREST WOULD BE DISSERVED BY THE REQUESTED INJUNCTIVE RELIEF.

Plaintiffs are asking for a preliminary injunction that will preserve a status quo that this Court has already decided is unlawful.  That cannot serve the public interest.  Congress has defined the public interest here through the ESA, and this Court has held that the ESA requires Plaintiffs to obtain permits for these animals (and that Plaintiffs' applications must be subject to 30 days of public notice and comment).  *A fortiori*, an injunction that will preserve the unlawful status quo and ignore the requirements of the ESA does not serve the public interest, and Plaintiffs' motion for preliminary injunction should be denied.

## <u>CONCLUSION</u>

The Service's decision to issue the challenged rule complies with the ESA and NEPA. Therefore, Plaintiffs are unlikely to succeed on the merits of their claims.  Plaintiffs also have failed to demonstrate that they will be irreparably harmed if the Court denies the requested preliminary injunctive relief while the Court adjudicates the merits of Plaintiffs' claims at

summary judgment.  Moreover, the requested injunction disserves the public interest.  For the

foregoing reasons, the Court should deny Plaintiffs' request for preliminary injunctive relief.

Dated: March 13, 2012

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Asst. Section Chief


*/s/ Meredith L. Flax*
MEREDITH L. FLAX
Sr. Trial Attorney (D.C. Bar No. 468016)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0404
Facsimile: (202) 305-0275
Meredith.Flax@usdoj.gov


*/s/ James A. Maysonett*
JAMES A. MAYSONETT
Trial Attorney (D.C. Bar No. 463856)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0216
Facsimile: (202) 305-0275
James.A.Maysonett@usdoj.gov

***Attorneys for Federal Defendants***